ls

**FILED**

OCT 1 0 2013

RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 567 - ) |
| vs. | ) | Judge Ronald A. Guzman |
| | ) | |
| WILLIAM MASTRO | ) | |

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, GARY S. SHAPIRO, and defendant WILLIAM MASTRO, and his attorney, MICHAEL D. MONICO, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

## Charge in This Case

2.     The superseding information in this case charges defendant with mail fraud, in violation of Title 18, United States Code, Section 1341.

3.     Defendant has read the charge against him contained in the superseding information, and that charge has been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crime with which he has been charged.

1

## Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the superseding information, which charges defendant with mail fraud, in violation of Title 18, United States Code, Section 1341.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the superseding information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

Beginning no later than in or about 2001 and continuing until approximately February 2009, at Oak Brook, Willow Brook, and Burr Ridge, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant MASTRO, Doug Allen, Mark Theotikos, Co-Schemer A, certain consignors, other auction house employees, and other known and unknown, knowingly devised and intended to devise, and participated in, a scheme and artifice to defraud the customers of Mastro Auctions, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and the concealment of material facts.   For the purpose of executing the scheme, defendant MASTRO caused an envelope to be placed in an authorized depository for mail matter on or about May 20, 2002.

Specifically, at times between 2002 and 2009, WILLIAM MASTRO was the owner or Chief Executive Officer of Mastro Auctions ("the Auction House"). Defendant MASTRO sold the company in 2004 but continued to serve as CEO.   The

2

Auction House accepted items, often sports memorabilia, from consignors and sold those items to bidders through auction. The Auction House held several auctions each year. The auctions were typically online, with bids placed electronically by customers of the Auction House. In connection with each auction, the Auction House caused catalogs to be sent across state lines to Auction House customers. According to the terms of the auction catalogs, the bidder who placed the highest bid at the conclusion of the auction "won" the item and purchased it from the consignor at the price set by the winning bid (the "hammer price"). Bidders paid a fee to the Auction House to purchase an item ("the buyer's premium"), and consignors were supposed to pay a commission to the defendant's company on items sold at auction ("the seller's fee").

At certain times between 2002 and 2009, defendant knowingly made, and caused to be made, materially false and fraudulent representations and concealed material facts in the Auction House catalogs, advertising, promotions, or other media. These misrepresentations deceived bidders into believing that defendant's company always conducted competitive auctions according to practices that applied equally to all auction participants, and deceived auction participants into believing that greater market demand existed for some items sold by the Auction House than actually was the case. In addition, defendant MASTRO, Allen, Theotikos and others at times engaged in practices designed to fraudulently inflate prices paid by bidders. Other times, defendant MASTRO, Allen, Theotikos and others engaged in

3

practices designed to protect the interests of consignors and sellers, which had the effect of artificially inflating the prices paid by some bidders.

Defendant MASTRO, Allen and Theotikos sometimes placed "shill bids," meaning fictitious bids placed without the intent to win the item, which had the effect of artificially inflating the price of an item in the auction. Defendant MASTRO believed that the more bidders that bid on a given item, the higher the price that item would realize. Defendant MASTRO also believed that active bidding on an item attracted more bidders to place bids on a particular item, because bidders were interested in purchasing items that were sought after by others. Defendant MASTRO also believed certain items and consignors needed protection from a sales price below an item's estimated market value. Defendant MASTRO understood that by placing shill bids on items that he did not intend to win, he stimulated bidding in the auctions amongst legitimate bidders who believed that they were bidding against other legitimate bidders, and not the auction house or consignor of the item. In addition to stimulating bidding and increasing the number of bidders, defendant MASTRO acknowledges that at times the bids he, Allen, Theotikos and other employees placed inflated the price of items, resulting in bidders likely paying more for an item than what they otherwise would have paid.

For example, in approximately 2002, defendant MASTRO placed shill bids to drive up the prices that a certain bidder, Individual T.N., paid for items that were being auctioned in the Auction House. Defendant MASTRO repeatedly shill bid

4

against Individual T.N.    Defendant MASTRO also shill bid against other individuals, including C.L. and C.D.

Defendant MASTRO also had access to ceiling bids because of his position, and, in some instances, received ceiling bids directly from certain bidders who placed their bids with defendant.    Allen also had access to ceiling bids because of his position. At times during the scheme, defendant MASTRO and Allen used ceiling bid information to drive up the bids of certain bidders, by placing shill bids below the bidders' ceiling bids.    Defendant MASTRO and Allen placed shill bids knowing that their bids would be automatically exceeded and their bids would not win.    For example, Allen had information that Individual C.L. placed a ceiling bid of $80,000 on a Mayo Football card set. Defendant MASTRO observed as Allen, using a paddle belonging to Owner A, placed shill bids on the Mayo Football card set knowing that his bids would not win and would trigger Individual C.L.'s ceiling bid.

Defendant MASTRO placed, and caused or allowed others to place, shill bids using several accounts, including an account belonging to a friend of an Auction House employee, the Auction House's corporate account, employee accounts, and an account in the name of defendant MASTRO's family member.    Defendant MASTRO intentionally concealed his participation in certain auctions and his shill bidding by using accounts other than his own.

For example, in the Americana Spring 2002 Auction, defendant MASTRO had knowledge that Individual T.N. was interested in American type collectibles to add to his investment portfolio.    Specifically, in the early 2000s, Individual T.N

5

contacted defendant MASTRO directly in order to place ceiling bids in the auctions. At times, Individual T.N. placed up to 100 ceiling bids through defendant depending on the auction. During these auctions, defendant MASTRO used a shill account belonging to a friend of an Auction House employee to drive up Individual T.N.'s ceiling bids. Defendant MASTRO placed shill bids on certain Americana items, among other items, with the intent that Auction House customers, including Individual T.N., pay more for their items than the customers otherwise would have paid. In or about May 2002, Individual T.N. purchased, among other items, a 1924 John W. Davis Jumbo Campaign Display Badge for $2,338 and a set of 1960 John F. Kennedy and Richard Nixon Campaign Posters for $2,205. Absent defendant MASTRO's shill bidding, Individual T.N. could have won the items at prices less than what Individual T.N. ultimately paid. Following the auctions, defendant MASTRO caused invoices and winning lots to be mailed to Individual K.S., who was an associate and business partner of Individual T.N.

Defendant MASTRO also was aware that Allen, Theotikos and other auction house employees placed shill bids using accounts not in their name. Specifically, Allen used an account in the name of Owner A to place shill bids. When placing bids using Owner A's account, Allen frequently said words to the effect of "I put [name] on that item," meaning that Allen had used Owner A's account to fictitiously drive up the price of an item.

At times, defendant MASTRO, Allen and Theotikos ensured that when they placed a shill bid and that shill bid was the highest bid at the end of an auction, that

item would not be purchased by the shill bidder. Instead, defendant MASTRO, Allen and Theotikos sometimes canceled, or caused the cancellation of, the sale of the item. As a result, defendant MASTRO, Allen and Theotikos had an advantage over legitimate bidders because they knew that if their shill bid was the winning bid on an item, the sale would be cancelled. This allowed defendant MASTRO, Allen and Theotikos to bid in the auctions without risk.

Defendant MASTRO also knowingly permitted five consignors to place bids on the consignors' own items, using shill bidding accounts belonging to nominees of these consignors to protect the value of those items, which had the effect of artificially inflating the sale price of those items. Between 2002 and 2009, the five consignors placed hundreds of bids on items the consignors owned, using shill accounts. At times, defendant MASTRO facilitated these consignors' use of shill bids. When these consignors' shill bids were the winning bid for an item, defendant MASTRO sometimes directed Auction House employees, including mail room employees, to return the auction item to the consignor, rather than delivering it to the nominee who had "won" the item. At times, defendant MASTRO waived fees due to the Auction House, including the hammer price, buyer's premium, and seller's fee. By waiving the fees, defendant MASTRO acknowledges that he gave those consignors an advantage over legitimate bidders because defendant enabled those consignors to bid, and shill bid, in auctions without risk. At times where fees were imposed on a consignor whose shill account had won an item owned by the consignor, defendant MASTRO caused the consignors, not the consignor's nominee, to pay the

fees associated with the transaction. Defendant MASTRO directed Auction House employees, including Co-Schemer A, to modify the Auction House's records to charge the consignor, not the consignor's nominee, with fees associated with the purported sale of the auction item.

In October 2007, the Auction House published a "Code of Conduct." While defendant was not aware of the Code of the Conduct at the time it was published, defendant MASTRO acknowledges that a customer who read the Code would understand the Code to apply to all auctions beginning in October 2007 and continuing forward. The Code of Conduct stated that access to "ceiling bid" information would be limited to one employee who would be prevented from bidding. At times after October 2007, the Auction House computer system allowed defendant MASTRO and other employees with bidding privileges access to ceiling bid information.

The October 2007 Code of Conduct stated that the Auction House would disclose to customers if items were owned by the Auction House, its employees, or any affiliated parties. Defendant MASTRO acknowledges that at times after October 2007, the Auction House failed to disclose items that were owned by the Auction House, its employees, and related entities, including items owned by a company affiliated with the Auction House called Historical Collectibles. Historical Collectibles was a company affiliated with the Auction House, and all of Historical Collectibles' merchandise, records, and other assets were maintained at the Auction House. Defendant MASTRO was responsible for day to day operations of Historical

8

Collectibles. Between approximately April 2008 and February 2009, defendant MASTRO knew that the Auction House failed to disclose ownership of over 1,000 items owned by Historical Collectibles and placed for sale through the Auction House. Beginning in late 2007 and continuing until at least late 2008, defendant MASTRO placed ceiling bids on several hundred items owned by Historical Collectibles, items that the Auction House effectively already owned. Defendant MASTRO often, but not always, placed these ceiling bids early in auctions. Defendant MASTRO knew at the time he placed the ceiling bids that ceiling bids would automatically competitively bid against legitimate bidders. Defendant MASTRO placed ceiling bids on Historical Collectibles items to stimulate bidding on those items, and also to protect the Auction House's investment in the items. At the time he placed those ceiling bids, defendant MASTRO knew that legitimate auction bidders would be unaware that it was defendant, and not other legitimate bidders, who was bidding against them.

The October 2007 Code of Conduct stated that Auction House employees were prohibited from placing bids on items owned by the Auction House, other Auction House employees, or other affiliated entities or individuals. At times after October 2007, defendant MASTRO and other employees placed bids on auction items owned by defendant, the Auction House, Historical Collectibles, and other Auction House employees.

9

### False Representations and Concealment of Material Facts

At no time did defendant MASTRO inform Auction House customers that he engaged in shill bidding, or that defendant facilitated certain consignors' use of shill accounts. Defendant MASTRO acknowledges that his failure to inform Auction House customers of this shill bidding activity was a material omission. As part of his duties as an Auction House executive, defendant MASTRO, Allen and Theotikos also made, or caused to be made, false statements regarding the manner in which the Auction House's auctions were conducted. As defendant MASTRO knew, each Auction House catalog represented that "items are sold to the highest bidder." At the time the catalogs were printed, defendant MASTRO knew that the "items are sold to the highest bidder" statement was, at times, false. Specifically, defendant MASTRO knew that in some auctions the highest bidder was actually placed by a shill account, and the items were not sold, but the sale canceled.

Consignment agreements entered into by consignors and the Auction House stated that a consignor, or agent of the consignor, was prohibited from bidding on an item tendered to the Auction House by the consignor. The consignment agreements stated that if the consignor violated this provision and had the highest bid on an item or lot, the consignor would be required to pay the Auction House the commission and buyer's premium on the item or lot upon which the consignor was the highest bidder. The consignment agreements further stated that there were no exceptions to this provision. At the time these statements were made, defendant knew them to be false. Specifically, defendant MASTRO knew that certain

10

consignors used shill accounts to bid on items owned by the consignors, and defendant facilitated this practice. Defendant MASTRO also knew that, at times, consignors were not required to pay the buyer's premium on lots on which the consignors' nominees were the highest bidder.

After the close of each auction, the Auction House posted the results of the auction on its website and also distributed the auction results through the mail to interested parties. Defendant MASTRO was aware at the time they were posted that the results, at times, contained false and misleading information. In particular, the results represented that items had been sold when, in reality, defendant MASTRO and certain consignors had placed the winning bid on multiple items and subsequently cancelled the sales. Defendant MASTRO, Allen, Theotikos and other employees caused the items to either be returned to the original consignor, including the Auction House, or to be re-auctioned at a later date. As a result of posting false auction results, the Auction House falsely represented that it sold in excess of 99% of items offered for sale.

### 1869 Cincinnati Red Stockings Trophy Ball

In approximately December 2006, defendant MASTRO contacted Individual C.L., and told Individual C.L. that an 1869 Cincinnati Red Stockings trophy ball, which was associated with a collection of trophy balls that Individual C.L. had previously purchased from the Auction House, was available for sale. At the time defendant MASTRO contacted Individual C.L., defendant and Allen were aware that the 1869 Cincinnati Red Stockings trophy ball had been returned to the Auction

House by Purchaser A, following laboratory testing conducted on the trophy ball. Defendant MASTRO and Allen were aware, based on the laboratory results, that the trophy ball contained paint which had been manufactured after World War II, thereby calling the item into question. Defendant MASTRO did not, at any time, inform Individual C.L. about the laboratory testing. Allen was aware, based on conversations with defendant MASTRO, that defendant MASTRO did not inform Individual C.L. of the laboratory results when he sold him the trophy ball. Defendant MASTRO acknowledges that the existence of the laboratory testing was material information that should have been disclosed to Individual C.L. On December 27, 2006, defendant sold the 1869 Cincinnati Red Stockings trophy ball to Individual C.L. for approximately $62,000.

### T206 Honus Wagner Card

In approximately 1986, defendant MASTRO purchased a T-206 Honus Wagner baseball card ("the Wagner Card"). When defendant MASTRO purchased the Wagner Card, the Wagner Card contained bowed borders, causing the card to be shaped like a football. Defendant MASTRO personally cut the side borders of the Wagner Card using a paper slicing machine. Defendant MASTRO sold the Wagner Card in approximately 1987, and failed to disclose that he had altered the Wagner Card by cutting the side borders. In approximately 1991, defendant worked with a New York auction house to auction the Wagner Card. While participating in the New York auction, defendant failed to disclose that he had altered the Wagner Card. In approximately 1992, defendant MASTRO was aware that the Wagner Card had

been submitted to a company that assigns numerical grades to baseball cards based on the condition of the cards. The Wagner Card was the first baseball card to receive such a grade. Based on industry standards in place today, defendant MASTRO acknowledges that had it been known that he altered the Wagner Card, the card would not have been eligible to receive a numerical grade. Defendant MASTRO acknowledges that a card with a grade is typically valued higher than a card that has been altered and is therefore unable to be graded. The Wagner Card was graded an 8 out of 10.

In approximately 2000, defendant MASTRO participated in another auction of the Wagner Card. The Auction House, in conjunction with a partner auction house, auctioned the Wagner Card for in excess of $1 million. During the 2000 auction, defendant MASTRO again failed to disclose that he had altered the Wagner Card.

On numerous occasions, defendant MASTRO made public statements regarding the Wagner Card during which he denied making any alterations to the Wagner Card. These statements were false, as defendant MASTRO had altered the Wagner Card by cutting its side borders.

Between 2002 and 2008, the Auction House advertised in various media, including on its website, in catalogues, and elsewhere, that the Auction House had participated in the sale of the Wagner card. This advertising distinguished the Auction House from other auction houses and was used to attract and retain customers.

The government agrees that the conduct related to the Wagner Card did not

13

involve any loss for purposes of calculating the sentencing guidelines.

## Execution of the Scheme

On approximately May 20, 2002, in Oak Brook, Illinois, for the purpose of executing the aforesaid scheme, defendant MASTRO knowingly caused to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Individual K.S., at an address in Maumee, Ohio, containing an invoice reflecting the sale of a 1924 John W. Davis Jumbo Campaign Display Badge and a set of 1960 John F. Kennedy and Richard Nixon Campaign Posters.

Defendant MASTRO admits that he intended to defraud the victims of the scheme, namely, customers who believed that they were placing competitive bids against other legitimate bidders and who, as a result of defendant MASTRO's shill bidding, should have paid less to win auction items than what they paid. Defendant MASTRO further acknowledges that the loss caused by the overall scheme between 2001 and 2009 was at least $50,000, and the offense involved at least 50 victims. Defendant MASTRO further acknowledges that he was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

7.    Defendant MASTRO disclosed the following self-incriminating information to the government pursuant to the terms of a proffer agreement. Pursuant to Guideline § 1B1.8(a), this information may not be used in determining the applicable Guidelines range for defendant:

14

In the early 2000's, defendant MASTRO wanted a "dead paddle," which he could use in order to place shill bids. After defendant MASTRO told William Boehm, the Auction House's Information Technology Director, what defendant MASTRO needed, Boehm told defendant MASTRO that he could use the account of Individual F.D., who was a friend of Boehm's. Boehm also told defendant MASTRO that he had created an account in Individual F.D.'s name (the "F.D. account") so that Individual F.D. would receive Auction House catalogs, but that Individual F.D. did not bid in auctions.

Defendant MASTRO used the F.D. account so frequently to place shill bids that individuals at the Auction House, who were aware of defendant MASTRO's use of the F.D. account, joked about its use. In or around 2003, defendant MASTRO began to feel embarrassed about his use of the F.D. account and, in an effort to conceal shill bids he had placed using the F.D. account, defendant MASTRO asked Boehm to destroy all Auction House underbidder records associated with the F.D. account. Defendant MASTRO further requested Boehm to maintain all historical and future winning bid information, but delete all historical and future underbidder records for all accounts. Defendant MASTRO specifically told Boehm his reason for wanting underbidder information destroyed, namely, that he did not want there to be any evidence of his shill bidding. In response, Boehm told defendant MASTRO that he would be able to fulfill his request.

After defendant MASTRO made the initial request to Boehm to destroy all historical and future underbidder information, defendant followed up with Boehm on

several occasions.   Boehm eventually told defendant MASTRO that his request had been completed and the underbidder records had been destroyed.   At no time did the Auction House deactivate the F.D. account due to purported financial problems with the account since the account was never used by Individual F.D. to actually bid on auction lots.

8.     The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

9.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.     A maximum sentence of 5 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or loss, whichever is greater.   Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court unless it determines that restitution is not applicable because determining complex issues of fact related to the cause or amount of the victim losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

16

c.    In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

10.    Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.    For purposes of calculating the Sentencing Guidelines, the parties agree on the following points, except as specified below:

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time the offense was committed. The following statements regarding the calculation of the Sentencing Guidelines are based on the November 2001 Guidelines Manual.

b.    **Offense Level Calculations.**

i.    Pursuant to Guideline § 2B1.1, the base offense level is 6.

ii.    The parties acknowledge that there are alternative and reasonable methodologies for the calculation of loss.   It is the government's position that the offense level is increased 14 levels pursuant to Guideline § 2B1.1(b)(1)(H) because the loss is more than $400,000 but less than $1,000,000.   It is defendant's position, according to his theory of loss, that pursuant to Guideline § 2B1.1(b)(1)(D), the offense level is increased 6 levels because the loss is more than $30,000, but less

17

than $70,000. Each party is free to argue its respective position at the time of sentencing.

        iii.     Pursuant to Guideline § 2B1.1(b)(2)(B), the offense level is increased 4 levels because the offense involved 50 or more victims;

        iv.     Pursuant to Guideline § 3B1.1(a), the offense level is increased 4 levels because defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

        v.     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

        vi.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c. **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d. **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, it is the government's position that the anticipated offense level is 25, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 57 to 71 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. However, because the statutory maximum sentence for the offense of conviction is 60 months, pursuant to Guideline § 5G1.1(a), it is the government's position that the applicable guideline sentence is 57-60 months.

e. Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation

officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.     Both parties expressly acknowledge that this Agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

12.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

13.    The government agrees that it will not recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons greater than 30 months.   Defendant shall be free to recommend any sentence.

14.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.l, to depart downward from the low end of the applicable Guideline range, and shall recommend a sentence of less than 30 months in the custody of the Bureau of Prisons. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court.

15.    Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1.

16.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

17.    Regarding restitution, the parties agree that restitution is not applicable because determining complex issues of fact related to the cause or amount

of the victim losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18.    If the Court orders restitution to the victims of the offense, it shall be due immediately, and paid pursuant to a schedule set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

19.    The parties agree to jointly recommend that at the time of sentencing the Court impose a fine in the amount of $250,000.

20.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

21.    Defendant agrees that the United States may enforce collection of any fine imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

22.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the indictment as to defendant.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

23.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 12 CR 567.

24.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

25.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

     a.     Right to be charged by indictment. Defendant understands that he has a right to have the charge prosecuted by an indictment returned by a concurrence of twelve or more members of a grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at

trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

      b.    **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

          i.    The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

          ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

          iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

          iv.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the

judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

c.    **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the Court sentences defendant to a term of imprisonment of 30 months or less, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was

determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution, in exchange for the concessions made by the United States in this Agreement. In addition, if the Court sentences defendant to a term of imprisonment of 30 months or less, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. Defendant may appeal any sentence that includes a term of imprisonment of more than 30 months.   The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this Agreement or to its negotiation, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

       d.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

26.    Defendant understands that he has the right to have the criminal charge in the superseding information brought within five years of the last of the alleged acts constituting the specified violation. By signing this document, defendant knowingly waives any right to have the charge in the superseding information brought against him within the period established by the statute of limitations. Defendant also knowingly waives any defense or claim based upon the statute of limitations or upon the timeliness with which the charge in the superseding information was brought.

### Presentence Investigation Report/Post-Sentence Supervision

27.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

28.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information,

may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

29.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

30.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

31.    The United States agrees not to seek additional criminal charges in the Northern District of Illinois against defendant for the conduct between 2001 and

February 2009, which occurred in the Northern District of Illinois, and which he has described in his proffers provided to the United States. However, nothing in this Agreement limits the United States in prosecution of defendant in other districts or for crimes not disclosed in his proffer, except as expressly set forth in this Agreement.

## Conclusion

32.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

33.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29

34.    Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

35.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

36.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 10/10/13

GARY S. SHAPIRO
United States Attorney

WILLIAM MASTRO
Defendant

NANCY DEPODESTA
Assistant U.S. Attorney

MICHAEL D. MONICO
Attorney for Defendant

STEVEN DOLLAR
Assistant U.S. Attorney

30