UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

------------------------------------------------------------------- X

UNITED STATES OF AMERICA,                  :
                                           .
                                           .
                         Plaintiff,        .
                                           :      No. 1:12-cr-00567
              v.                           :      Hon. Ronald A. Guzman
                                           :
WILLIAM MASTRO,                            :
                                           :
                         Defendant.        .
------------------------------------------------------------------- X


**SENTENCING MEMORANDUM OF WILLIAM MASTRO**


Jim Walden                                 Michael Monico
WALDEN MACHT & HARAN LLP                   Barry Spevack
One Broadway, 6th Floor                    Jacqueline Jacobson
New York, NY 10004                         MONICO & SPEVACK
(212) 335-2031                             20 South Clark Street, Suite 700
                                           Chicago, IL 60603
                                           (312) 782-8500


August 6, 2015

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    BILL MASTRO'S PERSONAL BACKGROUND AND CHARACTER ................................... 5

    A.    Personal History, Education, and Career ................................................ 5

        1.    Early Life .......................................................................... 5

        2.    A Pioneer in the Sports Collectibles Industry ........................ 7

    B.    Devotion to Family ................................................................ 14

    C.    A Lifetime of Compassion, Kindness, and Generosity .................... 17

        1.    Individual Acts of Kindness and Financial Generosity ......... 18

        2.    Personal Sponsorship of Hundreds of Recovering Addicts ......... 25

        3.    Religious Conviction and Pilgrimages to Medjugorje ............. 29

        4.    Service to the Chicago Community ...................................... 32

    D.    Physiological and Psychological Conditions and Necessary Treatment ......... 35

    E.    Genuine Remorse, Acceptance of Responsibility, and Cooperation ......... 36

III.    ADVISORY GUIDELINES CALCULATION .............................................................. 37

IV.    A SENTENCE OF PROBATION WITH A CONDITION OF RIGOROUS COMMUNITY SERVICE IS WARRANTED UNDER SECTION 3553(a) .......................... 42

    A.    An Individualized Assessment of Bill's Personal History and Characteristics Warrants a Non-Custodial Sentence. .......................................... 42

    B.    A Prison Term Is Not Necessary To Provide Adequate Deterrence or To Effectively Protect the Public. ................................................ 46

    C.    The Nature and Circumstances of Bill's Offense—Serious Conduct for Which He Has Accepted Responsibility—Are Consistent with a Non-Custodial Sentence .................................................................. 49

    D.    A Non-Custodial Sentence Would Avoid Unwarranted Disparities With Similarly Situated—Indeed, More Culpable—Defendants, Including Those Recently Sentenced in This Very District .......................................... 55

    E.    A Non-Custodial Sentence Would Constitute a "Substantial Restriction of Freedom" Sufficient To Punish the Conduct For Which Bill Has Accepted Responsibility. ...................................................................... 59

V.    CONCLUSION .................................................................................................. 63

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Doe v. United States,*
No. 14 MC 1412 (JG), 2015 WL 2452613 (E.D.N.Y. May 21, 2015) ...............................59

*Gall v. United States,*
552 U.S. 38 (2007) ................................................................................ 40, 46, 48, 59

*Kimbrough v. United States,*
552 U.S. 85 (2007) ...................................................................................................39

*People of the State of New York v. Schuster,*
No. 00660S-2004 (N.Y. Cnty. Ct. Oct. 7, 2004)....................................................57

*Rita v. United States,*
551 U.S. 338 (2007) .................................................................................................46

*State of New York v. Baranovich,*
No. 401698/2004 (N.Y. Sup. Ct. May 27, 2004) ...................................................56

*State of New York v. D. Lien, Inc.,*
No. 401477/2004 (N.Y. Sup. Ct. July 22, 2004)....................................................56

*State of New York v. EMH Group, LLC,*
No. 404967/2007 (N.Y. Sup. Ct. July 24, 2007).....................................................55

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006)..........................................................40, 41, 49

*United States v. Amiel,*
No. 08-cr-09 (N.D. Ill.) (June 15, 2011) ................................................................58

*United States v. Beach,*
No. 01-cr-105-3 (E.D. Cal.) (Apr. 17, 2001) .........................................................56

*United States v. Behrendt,*
No. 08-cr-71, 2008 WL 4643380 (E.D. Wis. Oct. 20, 2008).................................47

*United States v. Bengis,*
No. 07-cr-521 (N.D. Ill.) (July 15, 2013)...............................................................58

*United States v. Brady,*
No. 02-cr-1043 (JG), 2004 WL 86414 (E.D.N.Y. Jan. 20, 2004).........................59

*United States v. Brooks,*
No. 00-cr-1084 (S.D.N.Y.) (Apr. 29, 2002).......................................................3, 59

*United States v. Brubaker,*
663 F.2d 764 (7th Cir. 1981)..................................................................................48

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States v. Cage*,
No. 05-cr-983 (RG) (N.D. Ill.) (Oct. 24, 2008) ................................................................. 3

*United States v. Cole*,
765 F.3d 884 (8th Cir. 2014) ........................................................................................ 41

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013) ......................................................................................... 41

*United States v. Coughlin*,
No. 06-cr-20005, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008) .............................. 49, 59, 61

*United States* v. *Dean,*
414 F.3d 725 (7th Cir. 2005) ........................................................................................ 39

*United States v. Farha*,
No. 11-cr-115 (M.D. Fla.) ............................................................................................ 41

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................................... 41

*United States v. Haywood*,
No. 08-cr-1023-2 (RG) (May 2, 2013) ........................................................................... 48

*United States v. Hill*,
645 F.3d 900 (7th Cir. 2011) ........................................................................................ 40

*United States v. Howe*,
543 F.3d 128 (3d Cir. 2008) ............................................................................... 43, 44, 45

*United States v. Jordan*,
435 F.3d 693 (7th Cir. 2006) ........................................................................................ 40

*United States v. Khan*,
No. 10-cr-152 (C.D. Cal.) (Apr. 27, 2010) ..................................................................... 57

*United States v. Khan*,
No. 10-cr-152 (C.D. Cal.) (Oct. 4, 2010) ....................................................................... 57

*United States v. Milne*,
384 F. Supp. 2d 1309 (E.D. Wis. 2005) ......................................................................... 54

*United States v. Molton*,
743 F.3d 479 (7th Cir. 2014) ........................................................................................ 48

*United States v. Mueffelman*,
400 F. Supp. 2d 368 (D. Mass. 2005) ........................................................................... 41

*United States v. Ovid*,
No. 09-cr-216 (JG), 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) ...................................... 41

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States v. Panice*,
   598 F.3d 426 (7th Cir. 2010) .......................................................................... 55

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ............................................................ 41

*United States v. Powell*,
   576 F.3d 482 (7th Cir. 2009) .......................................................................... 45

*United States v. Robinson*,
   Nos. 13-cr-436 (JLL), 13-cr-437 (JLL), 2014 WL 1400197 (D.N.J. Apr. 9, 2014) .......................... 43

*United States v. Roth*,
   No. 05-cr-792-5, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ........................................ 47

*United States v. Schmitz*,
   717 F.3d 536 (7th Cir. 2013) .......................................................................... 40

*United States v. Sloan*,
   No. 05-cr-1025 (RG) (Oct. 11, 2007) .............................................................. 44

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ............................................................................ 48

*United States v. Taubman*,
   No. 01-cr-429 (S.D.N.Y.) (Apr. 22, 2002) ................................................... 3, 58

*United States v. Thurston*,
   544 F.3d 22 (1st Cir. 2008) ............................................................................ 43

*United States v. Trudeau*,
   No. 10-cr-00886 (N.D. Ill.) (May 28, 2014) ............................................... 4, 50

*United States v. Wachowiak*,
   496 F.3d 744 (7th Cir. 2007) .......................................................................... 45

*United States v. Walton*,
   No. 01-cr-105-2 (E.D. Cal.) (Apr. 17, 2001) ............................................... 56

*United States v. Warner*,
   No. 14-1330, 2015 WL 4153651 (7th Cir. July 10, 2015) ................... 40, 42, 43, 46, 47, 48, 59, 61

*United States v. Watt*,
   707 F. Supp. 2d 149 (D. Mass. 2010) .......................................................... 41

**Statutes**

18 U.S.C. § 3553(a) ............................................................................................ 39, 45

18 U.S.C. § 3553(a)(1) ...................................................................................... 39, 49

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

18 U.S.C. § 3553(a)(2)(A)-(D) ......................................................................................... 39

18 U.S.C. § 3553(a)(2)(C) ............................................................................................... 47

18 U.S.C. § 3553(a)(2)(D) ............................................................................................... 45

18 U.S.C. § 3553(a)(3) ..................................................................................................... 39

18 U.S.C. § 3553(a)(6) ................................................................................................ 39, 55

18 U.S.C. § 3561 .............................................................................................................. 59

18 U.S.C. § 3561(a)(2) ..................................................................................................... 38

18 U.S.C. § 3563(b) ..................................................................................................... 38, 60

28 U.S.C. § 994(j) ............................................................................................................ 60

**Other Authorities**

David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (Nov. 1995) ............................................... 49

Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. ILL. U. L. J. 485, 492 (1998) ................ 49

Michael Tonry, *Purposes and Functions of Sentencing*, 35 Crime & Just. 1, 28 (2006) ........................... 49

Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) ............................................... 60

Richard Frase, *Punishment Purposes*, 58 STAN. L. REV. 67, 80 (2005) ...................................... 49

U.S. Sent'g Comm'n, 2014 Sourcebook of Federal Sentencing Statistics, Table 27A .............................. 41

U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 33 (1987) ..................................................................................... 60

# LIST OF EXHIBITS

Page(s)

1.  Randy M. Mastro Letter....................................................................................5, 16

2.  Mary Lou Mastro Letter……………………………………………………6, 14, 29, 35

3.  Marshall Fogel Letter………………………………………………..…………………9

4.  James J. Spence, Jr. Letter…………………………………………………………..…10

5.  John J. Scott Letter………………………………………………………...……....10

6.  Thomas C. O'Connell Letter………………………………………….…………11

7.  Rex Stark Letter………………………………………………………..…………....11

8.  Albert H. Greenbaum Letter………………………………………………...…………11

9.  Hubert J. Santos Letter…………………………………………………………..12

10.  Dr. David A. Fleishman Letter………………………………...……………12

11.  Ann T. Resca Letter…………………………………………………………12

12.  David B. Bowen Letter…………………………………………………….…...……13

13.  Ashley Mastro Letter…………………………………………………….…………15

14.  Christina Mastro Letter…………………………………………………….………16

15.  Anthony Evora Letter…………………………………………………………18

16.  Jennifer Morales Letter…………………………………………………….………18

17.  Irene McCartin Letter…………………………………………………………19

18.  Hector Morales Letter……………………………………………………………19

19.  Shannon Welch Letter…………………………………………………………20

20.  John Markey Letter…………………………………………………………20

21.  Jan Kraft Letter…………………………………………………………...……21

22.  Joan Rundle Letter…………………………………………………….………21

23.  Ruby Harris Alexander Letter……………………………………………22

24.  Ewa Jedrol Letter……………………………………………………...………22

25.  Dr. John J. Hart Letter…………………………………………………………22

26.  James Prendergast Letter…………………………………………………23

27.  Tricia Leishman Letter……………………………………………….………23

28.  Rev. Frank A. Kurucz Letter……………………………………………24

29.  Meghan Moreno Letter………………………………………………….………24

30.  J. William Adams Letter…………………………………………………24

31.  Valerie A. Ward Letter………………………………………………...………24

## LIST OF EXHIBITS (continued)

Page(s)

32.    Rev. Edward J. Cronin Letter………………………………………….…………24

33.    Michelle Maxia Letter………………………………………………...…………24

34.    Rev. Michael M. Boland Letter……………………………………...……24, 34

35.    Frank E. Milos Letter………………………………………………….…………25

36.    Mike Wantiez Letter…………………………………………………..…………26

37.    Mitch Weiner Letter………………………………………………….…………26

38.    Dennis Parmley Letter………………………………………………….…………26

39.    Paul Shepard Letter…………………………………………………….…………27

40.    Gerald McAuley Letter…………………………………………………..………27

41.    Carl Joseph Garber Letter……………………………………………….………27

42.    Michael Ulbricht Letter…………………………………………….……………28

43.    Jason Salerno Letter…………………………………………………….…………28

44.    Fr. Svetozar Kraljevic Letter…………………………………………….………29

45.    Dr. Noreen Ann Salmon Letter…………………………………………...………30

46.    Tiffany Sullivan Letter………………………………………………….…………30

47.    Patricia Lynne Franklin Letter…………………………………………….………30

48.    Daniel A. Alberts Letter…………………………………………………...……31

49.    Fr. Pat Murphy Letter…………………………………………………….………31

50.    Sister Marie Clare Letter………………………………………………….………31

51.    Mother Gabrielle Marie Letter…………………………………………...………31

52.    Michael P. McMahon Letter……………………………………………….………32

53.    Bonnie Woodward Letter…………………………………………………...……32

54.    Timothy J. Rivelli Letter………………………………………………….………33

55.    Kathy Donahue Letter…………………………………………………....…33, 61

56.    Fr. Gerald Kelly Letter………………………………………………………...…34

57.    Jim Fogarty Letter……………………………………………………….………34

58.    Dr. Walter Whang Letter………………………………………………...…………36

59.    *United States v. Haywood*,
       No. 08-cr-1023-2 (N.D. Ill.), Sentencing Tr. (May 2, 2013)…..………………48

60.    *United States v. Trudeau*,
       No. 10-cr-886 (N.D. Ill.), Sentencing Tr. (Mar. 17, 2014)…………………………50

**LIST OF EXHIBITS (continued)**

Page(s)

61.    United States v. Trudeau,
       No. 10-cr-886 (N.D. Ill.), Government's Sentencing Memorandum
       (Mar. 10, 2014)…………………… ……………………………………..…..50
62.    Post on Net54baseball.com Forums (Apr. 9, 2013)…………………………………...…51
63.    Press Release, New York State Office of the Attorney General,

       Attorney General Cuomo Cracks Down on Internet Auction Fraud

       (June 7, 2007)..................................................................................................55

64.    Press Release, New York State Office of the Attorney General, "Shill Bidding"
       Exposed in Online Auctions (Nov. 8, 2004) ………………………....……56, 57

65.    *United States v. Taubman*,

       No. 01-cr-429 (S.D.N.Y.), Sentencing Tr. (Apr. 22, 2002)…………………………...58

Group Exhibit A…………………………………………………………………………13

Group Exhibit B…………………………………………………………………………17

Group Exhibit C…………………………………………………………………………24

Group Exhibit D…………………………………………………………………………29

Group Exhibit E…………………………………………………………………………32

Group Exhibit F…………………………………………………………………………35

## I.       INTRODUCTION

Bill Mastro has accepted responsibility for his crimes.  He has confessed those crimes to the FBI and the U.S. Attorney's Office, and to this Court.  He has confessed to his family and friends.  He has confessed to his priest, Father Edward Cronin, to his AA Sponsor, Frank Milos, and to the dozens of men he sponsors in Alcoholics Anonymous.  He has confessed and apologized to others in the sports-collectibles field, which he loved so much and feels genuine remorse for harming in any way.  And he has confessed to the many men and women he counsels and helps through his ministries.  In doing so, he has cited his own failings as a cautionary tale, to help others lead honest and productive lives.

No argument we make for leniency will change the reality that Bill has lived his remorse and regret every day for the past eight years, and that he will continue to own up to his misconduct for the rest of his life.  It has eaten away at him in ways that come through in the hundreds of letters of support penned on his behalf, especially those from his family, who speak of the shame and suicidal impulses he has suffered as a result.  Yet during this darkest period he has redoubled his efforts to do charitable good works, serving his religion and helping those in need.  We therefore express four hopes in this submission.

First, we hope that, in looking at the whole of Bill's life, this Court will see that—despite the wrongs he admits to having committed—he has also changed so many lives for the better.  Unlike others who have been described as philanthropists, Bill has worked quietly and directly, motivated by what the Senior Probation Officer describes as a "genuine sense of altruism" long predating this investigation.  He does not simply write checks; he is completely devoted with all of his resources and time.   He counsels people directly.  He mends with them.  He prays with them.  He works with them, whether it is helping them through emotional or substance-abuse

problems, financial straits, or physical labor.  He helps them financially and through personal

guidance.  And he works prodigiously, even walking Chicago's public housing projects each

week to reach out and help those in need.  Many, many people have come to depend on him.

Second, we hope that the Court sees that the important principles of deterrence—both

specific and general—have already been served in this case.  Bill has been out of the sports-

memorabilia industry since February 2009.  He cannot and would not go back.  His case is now

an epic tale within the industry, a lesson to all about the consequences of auction-related

misconduct.   It is for this reason that even the Government has advised this Court that Bill's

public confessions "provide a strong deterrent message to others in the industry, which was an

additional benefit to the government in this case."  *See* Government's Memorandum in Support

of the Proposed Plea Agreement (Doc. No. 79) at 3.

Third, we hope that, given the breadth and depth of its experience, the Court will put

Bill's offense in context when determining his ultimate punishment.  During Bill's time with the

auctions business, he had tens of thousands of customers.  He sold more than $300 million worth

of sports memorabilia.  Despite his transgressions, he helped create a vibrant industry, and

helped establish real standards for authentication and grading.  Many, many people have

collections they are proud of, and investments they have profited from, because of Bill.  Shill

bidding attributable to Bill's offense conduct inflated the prices of approximately 1% of the more

than 100,000 total lots sold by Mastro Auctions—unquestionably the exception, not the norm.

Moreover, Bill was not selling a fraudulent product: his collectibles were authentic, and people

continue to enjoy them and profit from them all over the country today.  This is not to say that

Bill's conduct caused no harm.  But he did not cause substantial financial hardship either: people

paid what they were willing to pay for these discretionary purchases—indeed, "might have spent

the same amounts of money absent the fraud," according to the Senior Probation Officer—even if, as Bill readily acknowledges, sometimes they should have paid less.  Furthermore, as the Senior Probation Officer notes, the average loss per customer did not cause "irreparable harm," and "unlike in most fraud schemes, [] the victims actually gained something of value."   In short, every one of Bill's customers received an authentic item they wanted, for a price they were willing to pay, with the bulk of the proceeds going to consignors, not the auction house, and with buyers typically experiencing an appreciation in value over time.  Again, we do not offer this perspective as an excuse or justification, but as relevant context for the offense conduct: Bill's misconduct, while wrong, was statistically infrequent, did not characterize his business practice, and did not cause any type of substantial financial harm typical of what this Court has seen in other financial-fraud cases.

We are mindful of this Court's admonition in *United States v. Cage* that "[u]nfortunately, our choices and actions have consequences, and those consequences cannot always be avoided." No. 05-cr-983 (RG) (N.D. Ill.), Sentencing Tr. 26:25-27:1 (Oct. 24, 2008).  But we are also unaware of anyone ever being incarcerated by any court anywhere for shill bidding alone— indeed, as detailed below, far more culpable defendants than Bill have received probationary sentences for even more egregious misconduct[1]—and that is especially so where, as here, the defendant pled guilty and provided substantial cooperation to the Government in bringing others to justice.

---

[1]  For example, in the auction industry's most notorious criminal case involving a $100 million price-fixing conspiracy between Sotheby's and Christie's that affected every one of their customers over a six-year period, Sotheby's CEO Diana Brooks, who was central to the conspiracy but cooperated in the government's prosecution of Sotheby's chairman Alfred Taubman, received a probationary sentence.  *See United States v. Brooks*, No. 00-cr-1084 (S.D.N.Y.).  Even Taubman, convicted of a felony and unrepentant throughout, received a prison term of only 12 months and a day.  *See United States v. Taubman*, No. 01-cr-429 (S.D.N.Y.); *see also infra* Section IV.D.

We hope, finally, that the punishment in this case is tempered by the recognition that Bill is truly contrite and has demonstrated his contrition by doing good works in the community—and he will continue to do so. In *United States v. Trudeau*, 10-cr-886 (RG) (N.D. Ill.), this Court noted the defendant's lack of contrition: "He has no true recognition of his own blame." Sentencing Tr. 86:13 (Mar. 17, 2014). Bill is different. He lives with self-blame every day, he wears it on his sleeve, he ministers about it, and it has motivated him to do good and continue to do even more good.

Taking Bill away from all the people who depend on him and whom he has served with devotion and passion—like the dozens of people in AA he sponsors and the hundreds of people he has taken at his own expense on religious pilgrimages, the many others to whom he ministers walking the housing projects of Chicago, and the countless others he has helped through his generous giving to worthy causes—would have unintended and far-reaching adverse consequences. The Court could sentence Bill to a long period of probation with stringent requirements of community service. And the Court could sentence Bill to the additional condition of home confinement when he is not serving his community. Bill accepted a fine that is more than double the highest end of the Sentencing Guidelines range—the maximum statutory fine—and he paid it even before sentencing. (PSR ¶ 111). Bill voluntarily left the industry he loved, and will never work in it again. He is a disgraced felon who is experiencing pain and remorse and punishment. The punishment and suffering he has inflicted upon himself, while surely not as severe as imprisonment, is nevertheless real and substantial. And we hope that with punishment also goes mercy for a good man who did bad things, knows he did bad things, and has demonstrated his commitment to making amends.

## II.     BILL MASTRO'S PERSONAL BACKGROUND AND CHARACTER

### A.     Personal History, Education, and Career

#### 1.     Early Life

Bill submitted a personal statement concerning the offense that includes a detailed description of his personal background. Additionally, the probation office prepared a thorough summary of Bill's personal and family data. (PSR ¶¶ 47-93).

Bill was born on December 6, 1952 in Summit, New Jersey. He is the older of two children born to Julius and Judith Mastro. Bill is extremely close to his brother, Randy Mastro, 58, who is an attorney living in New York City. Bill and Randy were raised in Bernardsville, a small town in Northern New Jersey. Their father, who died from lung cancer in 1999 at the age of 73, owned a local shoe store and taught political science classes at Drew University. While the boys revered and loved their father, he was regularly absent from the home due to his demanding work schedule, leaving their abusive and mentally ill mother to raise them. She died in 2010 from natural causes.

Bill's childhood was marred by extreme physical and emotional abuse. Bill's mother, whom Randy described as a "tormenting" and "deeply troubled woman," beat Bill regularly. (Ex. 1). Randy recalled that Bill "bore the brunt" of their mother's abuse mainly because he "did not back down," which only made her "beat him over and over again." Learning from his older brother's mistakes, Randy was able to avoid their mother's "wrath," allowing him to excel academically in high school and achieve excellence in higher education. *Id.*

Bill was not as fortunate. The severe physical, mental, and verbal abuse he suffered on a daily basis made him afraid of everything and lacking in self-worth. A "social misfit" and small for his age, Bill was often the target of bullying at school. With no safe haven at home or at school, Bill's only refuge was collecting baseball cards and sports memorabilia.

By the time Bill attended Moravian College in Bethlehem, Pennsylvania, he came to find solace in alcohol, drinking excessively in order to escape the trauma of growing up with a "tormenting mother traumatized by alcoholism herself." *Id*. He graduated and moved to Chicago in 1975 to attend respiratory therapy school at the University of Chicago. After receiving his certification, Bill began working at the University of Chicago Hospital and Clinics as a respiratory therapist. But he kept drinking. Finally, in 1980, after nine years of drinking, the failure of a marriage, the loss of friends, and several alcohol-related car accidents that nearly killed him, Bill found "AA and a path to sobriety and success." He earned his sobriety one year later, in November 1981. He has not consumed alcohol since.

It was in that same year, while working in the respiratory department at Rush Hospital, that Bill met Mary Lou Bonnamy, a nurse. When they met, she too struggled with alcohol addiction. From the beginning, Mary Lou remembers being drawn to Bill because of his "obvious compassion for others and his desire to help those in need." (Ex. 2). Bill took Mary Lou to her first AA meeting and introduced her to a fellowship of women who could help her through sponsorship. Now 32 years sober, and the President and CEO of Elmhurst Memorial Hospital, Mary Lou credits Bill's "compassion, attention, and gentle guidance" for providing her with hope and allowing her to escape the "downward spiral of alcoholism."

Bill and Mary Lou married on September 11, 1982, and will celebrate 33 years together next month. After several failed pregnancies, their daughter Ashley was born in 1987. Five years later, they adopted their daughter Christina, and their son Jay Alex was born in 1994. In 1995, the family moved to a home in Palos Park, where they still live today. Raised as a Presbyterian, Bill converted to Catholicism in 1999 and, as discussed in detail below, "committed [himself] to becoming a good Catholic, not only by attending Church but also by

6

becoming closer to God through helping others." (Defendant's Version of the Offense ("Defendant's Version") at 5).

In 2003, Bill and Mary Lou went on a "life altering" pilgrimage to Medjugorje in Bosnia. (*Id.*) Since that first pilgrimage, Bill has sponsored and led hundreds of individuals on pilgrimages to Medjugorje with the hope that they too will be transformed. As the Court will see from the letters submitted to the Court on his behalf, Bill has more than fulfilled that goal, not only through his work in Medjugorje, but also through his countless acts of kindness, AA sponsorship of hundreds of men over the last three decades, and his important community service with The Catholic Charities of the Chicago Archdiocese and the Brothers and Sisters of Love.

### 2.     A Pioneer in the Sports Collectibles Industry

Bill began collecting baseball cards and sports memorabilia as a small child to escape the chaos of his abusive home. Whatever income he earned, he used to buy baseball cards. By age 13, Bill spent hours sorting through the vast card collection that he had created with his own money, committing to succeed one day on his own terms. (*Id.* at 2-3). As he got older, Bill continued to collect cards and it became more of an organized hobby for him.

In 1981, Bill quit his job at Rush Hospital and decided to pursue his passion, collecting and selling sports memorabilia full-time. Travelling all over the country to homes and businesses to view collections, Bill's office was a "briefcase and a phone." He attended every convention that he could and scoured the trade publications for sports memorabilia. (*Id.* at 4). It soon became apparent to Bill that the future of high-end sports memorabilia would be in the auction houses. His goal was to legitimize the hobby by reaching out to sophisticated investors, who would buy and sell sports memorabilia in the same way they did with artwork. *Id.*

In 1990, with this vision in mind, Bill convinced Sotheby's to hold the first high-end sports memorabilia auctions, with Bill serving as the auctions' coordinator / consultant. After the success of that venture, in 1996, Bill founded Mastro Auctions. Two years later, Mastro Auctions launched its first online auction.

In mid-2004, Bill sold a 100% interest in Mastro Auctions to a private investment group, which still owes Bill about $1.5 million. (PSR ¶ 86). After the sale, Bill remained with the company as the Chief Executive Officer. He no longer conducted the daily operations of the business and became a salaried employee by contract.

In February 2009, Mastro Auctions shut down and Bill left the industry. By that time, Mastro Auctions had served tens of thousands of customers, auctioned off more than 100,000 lots, and sold more than $300 million worth of collectibles. As the Court is aware, the focus of the Government's investigation—confirmed through Bill's multiple proffers and substantial cooperation—was the use of shill bidding to drive up prices in Mastro Auctions sales. The Government also alleged, and Bill acknowledged, a number of false and misleading statements made in connection with that shill bidding—most of which involved failure to disclose the practice or marketing claims that were false because of the practice—and the sales of two items that, while authentic, were altered.[2] Bill pled guilty to and accepted responsibility for this misconduct on October 10, 2013. (Plea Agr. (Doc. No. 99)).

---

[2] Although the vast majority of the offense conduct concerns shill bidding, Bill has also accepted responsibility for his role in the sales of two authentic items whose condition or appearance was altered. First, Bill acknowledged having personally altered one item, the T-206 Honus Wagner card, by cutting its side borders. (Plea Agr. (Doc. No. 99) at 12-13). Bill voluntarily waived the statute of limitations to acknowledge this conduct. Although the Wagner card was authentic, Bill was not honest about the alteration when he sold it and for years afterward. Bill has now fully disclosed and accepted responsibility for the alteration, and the Wagner card remains one of the most valued items of sports memorabilia, having resold since these allegations became widely publicized for its highest price ever. The Government agrees that Bill's conduct related to the Wagner card did not involve any loss for Guidelines purposes. (*Id.* at 13-14). Second, Bill acknowledged having failed

*(Cont'd on next page)*

Bill's exit from the industry, guilty plea, and cooperation in this case sent shock waves around the industry. Indeed, even before Bill's substantial cooperation, the Government stated that Bill's "candid" and "public" acceptance of responsibility sent a "deterrent message to others in the auction industry" and was important to "the overall law enforcement mission of the government." *See* Government's Memorandum in Support of the Proposed Plea Agreement (Doc. No. 79) at 15. As many of the letters submitted to the Court attest,[3] Bill's public confession had such a profound effect precisely *because* he was a pioneer within the industry, professionalizing and improving the experience for consignors and collectors alike.

Those letters provide the specific, first-hand evidence of Bill's profoundly positive influence on the industry despite his transgressions. Marshall Fogel, a former prosecutor, practicing attorney, and nationally known collector of baseball memorabilia for more than 25 years, witnessed the growth of the sports memorabilia industry from its early beginnings. (Ex. 3). He credits Bill with transforming a "nascent struggling hobby" into the "thriving $100 million per year industry" that it is today. According to Mr. Fogel, Bill's creation of descriptive, detailed auction catalogs not only increased public access to quality memorabilia, but also

---

*(Cont'd from previous page)*

to alert a purchaser about certain laboratory testing suggesting that his item, an 1869 Cincinnati Red Stockings trophy ball, may have been touched up with paint manufactured after World War II. (*Id.* at 11-12).

Without in any way minimizing the seriousness of these two incidents, we note that the offense conduct almost exclusively consisted of shill bidding on items that were in all respects authentic—misconduct that has traditionally been viewed as a civil wrong, and which has never, so far as we have been able to determine, alone resulted in the imposition of a prison sentence. *See infra* Section IV.D. Because these items were authentic, it is not surprising that many if not most of them appreciated in value over time. Of course, the items' subsequent appreciation in value does not mean that individuals did not lose money—Bill readily acknowledges that many customers should have paid less for their items than they did—but it does underscore the fact that those victims received an authentic item of value. Indeed, the Senior Probation Officer observes that "the actual harm of the instant scheme is perhaps further mitigated by the fact that, unlike most fraud schemes, in the instant case the victims actually gained something of value." (S.R. at 2).

[3]    As the Court will see, many of the letters submitted on Bill's behalf are addressed to the judge originally assigned to this case and pre-date Bill's guilty plea on October 10, 2013. As evidenced by many of these early letters, Bill took responsibility for his conduct even before his guilty plea in this case.

"single handedly legitimized the sports collectibles industry."  Mr. Fogel credits Bill as *the* person "who introduced the trend of writing clear descriptions of items, including information on provenance," which helped "collectors obtain higher quality inventories with greater value than ever thought possible."

James Spence, an independent autographed memorabilia authenticator, similarly describes Bill "as a trailblazer in legitimizing the sports memorabilia industry."  (Ex. 4).  Mr. Spence believes that Bill "deserves exclusive credit for pioneering what has become today's standard of integrity in the autographed memorabilia business."  It was Bill's commissioning of authenticators like Mr. Spence to "separate authentic items from those which were forgeries"— previously undetected in the industry—that allowed Mastro Auctions to be "the first to offer a product that would garner both universal trust and authentic value."  Mr. Spence recalls that, before Bill's "intervention" into the authentication of items, it was the standard practice for auction houses to accept and sell any items from large consignors, regardless of authenticity. Importantly, other auction houses, dealers, and collectors eventually followed Bill's example, which is why Mr. Spence concludes that the sports memorabilia industry has "been a better business environment ever since Bill's involvement."

John Scott, a former auction house owner who has been involved in the baseball card and sports memorabilia industry since 1976, has written a letter of support for Bill even though they were once fierce competitors.  (Ex. 5).  He too describes Bill as someone who "promoted value" in the industry and as a "proponent of authentication."  Even though Mr. Scott often competed with Bill to obtain collection consignments, Mr. Scott recalls that Bill and his companies were always "professional and congenial."  Bill has openly and frankly discussed his misconduct with

Mr. Scott, leaving him certain that Bill is genuinely remorseful for the harm that he has caused clients and the industry.

Thomas O'Connell, a longtime hobby journalist and the former editor of *Sports Collectors Digest*, has written extensively about the sports memorabilia industry and auctions. (Ex. 6). He has known Bill for about 25 years and has spent a significant amount of time with him while writing articles about Mastro Auctions. Mr. O'Connell believes that "many of the important auction rules and safeguards for both consignor and bidder were heartily championed by Bill over the last 20 years." Despite Bill's offense conduct, Mr. O'Connell can state with "assurance that the sports memorabilia hobby/industry is deeply indebted to him for much of the work that he has done and in his efforts to raise the profile of his business and to ensure that the hobby was as honest and as transparent as possible."

Rex Stark, a full-time dealer in historical Americana for 37 years, also recognizes Bill as someone who has "contributed tremendously to the high visibility and nationwide appeal of sports collecting today." (Ex. 7). Just as Bill has confessed to others, Bill admitted his transgressions to Mr. Stark, and expressed his remorse to him. Still, Mr. Stark considers Bill to be "one of the most honest, reliable, and hardworking people in the business." As an industry insider for nearly four decades, Mr. Stark believes that Bill's "public acceptance of responsibility will highlight conduct that is in fact very commonplace in the world of auctions," and that Bill will, in this way, "once again contribute to making the auction business more reliable and transparent."

Beyond his immense role in legitimizing the industry, Bill's reputation for fairness and generosity has prompted many Mastro Auction customers to write letters on his behalf. Albert Greenbaum, a self-described small-time antiques collector and dealer, recounts that all of his

11

dealings with Bill have been fair with regard to price and excellent with regard to the value and condition of the items. In selling items to Mr. Greenbaum, Bill "was conservative in the descriptions of condition, quality, and pricing." (Ex. 8). In fact, Mr. Greenbaum often felt that the purchased items were even better than Bill described. Even though Mr. Greenbaum was a "small-time dealer," Bill always treated him with respect and courtesy, inviting him to dinners after auctions or conventions with other "big" industry people. Mr. Greenbaum remembers how, on one occasion, Bill sent him some items that he had not ordered. When Mr. Greenbaum called Bill to tell him there must have been a mistake, Bill told him they were items that he could not use, but that he thought Mr. Greenbaum would like. Bill would not accept any money from Mr. Greenbaum for the items, not even for the postage.

Hubert Santos, a federal criminal lawyer in Connecticut, first met Bill after contacting him to sell a collection of presidential campaign memorabilia. (Ex. 9). Mr. Santos was not optimistic about the consignment, and told Bill that he needed to sell the collection in order to fund a trust for his disabled son. Mr. Santos recalls that "Bill was very empathetic with my son's situation and worked hard to make the auction a success. He spread the auction over two years and the preparation of the auction catalogs by Bill and his photographers and writers was first rate." Years after the auction concluded, Bill always made it a point to ask Mr. Santos about his son and how he was doing.

When David Fleishman's brother passed away at 44 from pancreatic cancer, leaving behind a wife and three children, Mr. Fleishman turned to Bill to help him sell his brother's sports memorabilia collection. (Ex. 10). Mr. Fleishman recalls that Bill, knowing that the proceeds from the sale of the collection were going to be used by his brother's widow and her children, "treated his sister-in-law with great compassion and extreme fairness."

Ann Resca, a retired teacher, also turned to Bill to help her family sell a box of rare baseball cards that belonged to her deceased father. (Ex. 11). After meeting with several individuals that she found to be "manipulative and dishonest," Ms. Resca was relieved to meet Bill. Not only was he straightforward, patient, and polite, he also looked out for her and her family's interest. Given her numerous positive experiences with Bill over a 20-year period, Ms. Resca was "surprised and flabbergasted" to hear about Bill's case.

Equally surprised was Dave Bowen, who met Bill about 20 years ago when Mr. Bowen began collecting sports memorabilia. (Ex. 12). Bill impressed Mr. Bowen with his knowledge, confidence, and the fact that he seemed to know everybody. As he got to know Bill better, Mr. Bowen "learned that Bill was not just a great businessman, but he was also a kind and friendly individual." When he visited Bill's office, Mr. Bowen noticed that all of the Mastro Auctions employees adored Bill, including the widow of Bill's former partner. Mr. Bowen also "saw a group of individuals ranging from well-dressed to freshly off the street looking men go into his conference room for a meeting that turned out to be an AA meeting. Bill greeted everyone who entered with a smile, hugs, laughter, and a genuine 'So glad you are here.'" To Mr. Bowen, his observations also revealed that Bill "was tied to his roots [and] compassionate towards others, no matter what their place was in society." Bill fully acknowledged his misconduct to Mr. Bowen, who describes Bill's fall as "terribly sad for many reasons, including that the best most creative person in the Hobby, Bill Mastro, is no longer there."

As demonstrated by the numerous letters of support discussed above and the additional letters attached as Group Exhibit A, Bill's contributions to the betterment of the industry and his acts of professionalism are remembered by his competitors and customers, who wrote despite

knowing about Bill's transgressions. These letters of support show that many collectors still value Bill's many positive contributions and acts of fair dealing.

### B.     Devotion to Family

Bill has been married to his wife, Mary Lou, for 32 years. She describes Bill as a "wonderful father and devoted husband" and the "most generous, compassionate, and selfless man that I have ever met." (Ex. 2). Though Bill was a professional trailblazer, for Mary Lou it is her husband's "life-long commitment to helping others that is the core of his personality." He has "lived a life defined by countless acts of kindness, love, and generosity." During their nearly 33-year marriage, Mary Lou has never seen Bill turn down anyone who asked for help. From the "literally hundreds of individuals suffering from alcoholism or drug use" that he has counseled to an unknown homeless stranger on the street, Bill has given his "time, talent, and resources … without any expectation of receiving something in return." While Mary Lou has personally witnessed many of Bill's kindnesses, she was overwhelmed to learn about additional good deeds "when people who he had helped in the past approached asking if Bill wanted a character letter." It is for all of these reasons that Mary Lou "can affirmatively say that Bill's conduct in this case does not define his personality" or character, and that the conduct that Bill admitted to "is in stark contrast to the values that he has conveyed to our children throughout his lifetime of selfless giving of himself and his resources."

Mary Lou has taken tremendous comfort in the outpouring of love and support she and her family have received. But this case has left her heartbroken. Over the last eight years, she has observed Bill's daily struggle over the choices he made. Bill has repeatedly apologized to her and their children. She knows that "Bill is especially sorry for bringing sadness, anxiety, shame, and fear into our home."

Mary Lou also worries about their three children, who have all been deeply affected by this experience. Ashley and Christina "have spent countless hours crying," while Jay Alex, who was only 14 years old at the time this investigation began, "initially responded with anger and acting out." After three school suspensions and intensive counseling, Jay Alex is now much improved and remains close to his father, though he prefers to spend most of his time away at school because it "is a place where he can be removed from the grief that his home environment provokes."

While Bill is now different from the man Mary Lou married, owing to a decrease in his "optimism, cheerfulness and social behavior," Mary Lou is thankful that the "aspects of Bill's character that [she] loved the most, his compassion and charitable nature, are still present." He is still an excellent, involved father, and "is as committed, if not more committed, to the cause of helping people in need." Mary Lou feels that Bill is "truly at peace with himself" only when he is helping others, either through AA, Catholic Charities, or the Brothers and Sisters of Love. She writes, "Bill genuinely believes that God wants him to help the needy and that is what he does on a daily basis." Mary Lou prays for leniency for Bill, and knows that if he is given this "sacred opportunity, he will be a lawful and productive citizen and spend the rest of his days continuing to give back to the community and the people around him."

The faith and confidence that Mary Lou has in her husband is matched by the love and admiration that Bill's daughters, Ashley (27) and Christina (23), have for their father.[4] Ashley describes her father as a "truly remarkable human being." (Ex. 13). He has been her close confidant since she was a child. For example, when Ashley was in high school, Bill stayed up

---

[4] Bill's 21-year-old son was not able to write a letter to the Court, fearing the emotional turmoil this would cause him. Only 14 years old when this case began, he has worked very hard in counseling to deal with his emotions surrounding this case. Nevertheless, he is very close with his father and Bill is very involved in his life.

with her all night to help her study for a history exam, about which she was very worried. When she was in college, he traveled to visit her for a weekend just to spend time together. Even though her father has talked to her in detail about his crime, Ashley remains "so very proud to call Bill Mastro" her father because, in her words, "he is the most unselfish person that I know." She has observed her dad's "crushing depression" and guilt about the pain he has caused their family and others. Ashley has seen Bill go from an energetic, outgoing person to someone who is now "lethargic and subdued," though he has "remained a pillar of the community" throughout, and is "as committed as ever to his sobriety and helping others."

Like Ashley, Christina marvels at her dad's ability to overcome his own life's difficulties and continue to "give and give, without expecting anything in return." (Ex. 14). Christina describes her dad "as the most compassionate and genuine person I know." Not only has Bill played a "pivotal role" in her life "through all of the turbulent years of adolescence," but there is not one "day that goes by that he is not personally changing someone's life." For Christina, Bill's mistakes will never overshadow the "love that he has surrounded me with my entire life," and that "has made me a happy, confident, and self-assured person."

Bill's brother Randy echoes these same themes of love and profound respect. (Ex. 1). For Randy, Bill's ability to persevere despite a deeply "troubled childhood and how much good he has done since then … speaks to his true character and genuine commitment to turning his life around and devoting himself to others." Randy witnessed first-hand Bill's childhood traumas and the struggles that arose from those traumas, including Bill's battle with alcoholism. Recognizing that Bill bared the brunt of their mentally ill mother's devastating physical and emotional abuse, Randy is tremendously proud of his brother for rebuilding his own life and for tirelessly devoting himself to other troubled people.

16

Randy believes that it was his brother's intense desire to "make their dad proud" that motived Bill to turn his "passion since childhood" into a pioneering successful business. And, though Bill has confessed to his brother and taken full responsibility for his extreme fall from grace, Randy hopes that the good Bill did for the industry will not be ignored. Not only, Randy writes, did Bill serve "tens of thousands of satisfied customers in facilitating hundreds of honest transactions that helped collectors realize fair value for authentic goods," but he "helped transform a hobby populated by oddballs and misfits into what it is today—a respected field for serious collectors and enthusiasts alike."

Still, for Randy, like Bill's other immediate family, Bill's true success in life is measured not by money, but by his lifelong devotion to helping those in need. Whatever his own fortunes—whether just starting his own business or having reached the top of his profession—Bill "never took his success for granted" or neglected those less fortunate than him. Even while Bill struggled with severe depression and shame throughout this long investigation, he never abandoned the many individuals and charities that rely on his generosity. In fact, Randy has witnessed Bill increase his efforts to serve others; that is the "one thing that has kept him going." Randy concludes, "for all of the good I like to think I have done in my career as a federal prosecutor, public official, and lawyer, it pales in comparison to all my brother has done to help others and the lives he has changed for the better."

Letters from Bill's other family members are collected and attached to this submission as Group Exhibit B.

### C.     A Lifetime of Compassion, Kindness, and Generosity

Throughout his life, Bill has made significant contributions of his time and talents to the community. In addition to his family members, those who have witnessed Bill's lifetime of giving and have personally benefitted from Bill's generosity have written letters to the Court on

17

Bill's behalf.  Given the large number of letters received, we have organized them into groups, recognizing that many of the letters reflect common themes.

### 1.        Individual Acts of Kindness and Financial Generosity

Anthony Evora's chance meeting with Bill at an AA convention in Seattle, Washington completely changed his life.  (Ex. 15).  When they met, Anthony lived with his wife and young children in "a drug infested and dangerous neighborhood" in New York City.  Anthony and Bill kept in touch after the AA convention.  During one of their many conversations, Anthony told Bill about how he feared for the safety of his family after his wife had been mugged in the hallway of their apartment building.  Bill immediately extricated Anthony and his family from their situation and relocated them to a safe neighborhood outside of Chicago.  Not only did Bill find the Evora family a safe home where their children could thrive, Bill gifted the down payment on the home and had it completely rehabbed and furnished.  Most important, he helped Anthony, who had worked for AT&T for 12 years in New York City, find gainful employment with Illinois Bell.  Once Anthony and his family settled in their new home, Bill continued to provide Anthony with emotional support, bringing Anthony to his local AA meetings and mentoring him.  In his letter, Anthony proudly tells the Court that with Bill's emotional guidance and support, "for the first time in a long time, my wife and I felt safe and comfortable in our home with our children."  Anthony has now been sober 25 years.

Jennifer Morales, who today is a sober, Post-Doctoral Fellow in Clinical Psychology with the Village of Hoffman Estates Department of Health and Human Services and a married mother of two young children, has written a letter about how Bill's extraordinary intervention profoundly changed her life.  (Ex. 16).  Jennifer grew up in an "alcoholic home that was extremely broken and dysfunctional."  Her earliest memories of life were "of feeling alone,

unloved, worthless and afraid." When she met Bill she was travelling down a dangerous path and was virtually a stranger to him. Despite this, in 2002, Bill and his wife moved Jennifer into their home and raised her like one of their own children for the next six years. Today, Jennifer remains so close with Bill and Mary Lou that Jennifer's children call them grandma and grandpa.

Jennifer recalls how living with the Mastro family felt extraordinary because it was the first time in her young life that she experienced what it was like to live in a "true home" where she was not terrified and abused on a daily basis, but was instead "loved and cared for" as she should have been. There is no doubt in Jennifer's mind that without Bill's intervention and continuing emotional support in her life she would not be the successful and sober wife, mother, and psychologist that she is today. Growing up in the Mastro household, Jennifer witnessed how Bill positively changed the lives of so many people that it would take "pages upon pages" to describe and still would be "inadequate when trying to truly characterize how much Bill has done for the good of all those with whom he interacts."

Jennifer's mother Irene McCartin agrees, describing Bill as her child's "safety net and mentor," who provided her with "stability and a beautiful family who welcomed her and gave her an opportunity to experience and live a stable family life." (Ex. 17). Immensely proud of Jennifer's sobriety and accomplishments over the last 14 years, Irene believes that "God acted through Bill to save" Jennifer. Irene calls herself "a mother humbled by the truth and substance of Bill's love and generosity."

Jennifer's husband Hector Morales, a Chicago police officer, is also grateful to Bill for "saving" Jennifer's life and allowing her to become the wife, mother, and community member that she is today. (Ex. 18). Hector compares Bill to his own father—a factory worker who worked hard to provide his children with an excellent education and loved and encouraged them.

For Hector, having a "dad" like Bill in her life allowed Jennifer to not only "find her way in the world" but also to "create a life with [Hector] that she never imagined during her dark days."

Shannon Welch, a friend of Bill's daughter Ashley, describes the Mastro residence as her "second home." (Ex. 19). For Shannon, the Mastro home was her refuge when she was a young girl and her father was suffering from multiple sclerosis and cancer. She will never forget how, on her eighth birthday, Bill threw her a surprise birthday party because her own father was too ill to celebrate. For Shannon, the memory of that party and the continuous outpouring of love she received was a "bright spot" in her otherwise difficult childhood. When Shannon was 11 years old, her father died of leukemia. Shannon recalls feeling comforted by Bill's love and presence, as a "strong, caring, compassionate man to shepherd me throughout life." A true father figure, Bill taught Shannon "the fundamental truths" of "fairness and respect" to others in the community.

John Markey, who has known Bill for over 30 years, also believes that he would not have survived without Bill's help. (Ex. 20). About 15 years ago, John's marriage fell apart and he became "spiritually broken," depressed, and suicidal. John convinced the doctors to call Bill rather than hospitalize him. The doctors released John to Bill after receiving assurances that Bill would care for John. John wound up living with the Mastro family for the next six months, during which time Bill patiently counseled him and provided him with friendship and emotional support on a daily basis. Even after John felt stable, Bill continued to help him get back on his feet by loaning him money for a down payment on a condominium and continuing to be there as a friend. According to John, Bill helped him survive by giving him "hope" that he had "a life worth living."

20

Bill provided Jan Kraft, a single mother of three children, with similarly sustaining hope. (Ex. 21). She has known Bill and his wife for more than three decades. In 1985, Jan's husband abandoned her and her children, one of whom was a sick child requiring many hospitalizations, leaving them without any money to pay bills or other living expenses. After the abandonment, Jan turned to Bill for help. He helped her purchase an affordable home in a safe neighborhood, gave her money to pay bills and buy Christmas presents, and even bought her a family car. Most importantly, Bill restored Jan's self-worth by "taking a chance" on her and giving her a job at Mastro Auctions.

Bill did the same for Joan Rundle, who has known Bill since 1983. (Ex. 22). Now in her 70s, Joan remembers how Bill helped her during a "terrible separation" from her husband that left her virtually homeless and without any money. Even though she did not ask him for help, Bill reassured her that he would help her through this difficult time. Joan feared leaving her old neighborhood because she did not want to make her children change schools or be too far from her AA meetings. Bill found Joan a townhome in a safe part of her neighborhood and paid for part of its cost. He also employed Joan in his home to help with the children while he and Mary Lou were at work. Working for the Mastros for so many years, Joan learned that she was not the only one who benefitted from Bill's generosity. Bill did not talk about any of the good deeds he had done or expect praise. For example, Joan recalls hearing from another AA member that Bill had bought a handicapped van for one of the men in their AA group after the man had suffered a disabling accident, so he could continue to attend AA meetings and doctor's appointments. Bill never mentioned this unique act of kindness. According to Joan, Bill is the type of person who helps people from the goodness of his heart. Thirty-two years later, Joan is very grateful to still have Bill, who is like a brother to her, in her life.

Ruby Harris Alexander, who has known Bill since 1987 when she babysat his daughter, went from employee to friend as well. She describes Bill as the "kindest, most generous and best friend I ever had." (Ex. 23). Ruby is eternally grateful to Bill for helping her son Peter, who was born with a large and disfiguring birth mark on the side of his face. Ruby and her husband always wanted to have the birthmark removed through surgery, but this became impossible after Ruby's husband lost his job in 1989, requiring Ruby and her family to move to Tennessee. Bill never forgot Ruby and her wish to help her son. After Ruby found a surgeon who could safely remove the birthmark, Bill paid $3,000 for the surgeon to begin treatment. When Ruby's husband died in 1999, Bill told Ruby she could come back to Chicago and move in with them. She did not, but she will never forget Bill's generous invitation or the many kindnesses that he has shown her across the years.

Ewa Jedrol, who worked for the Mastro family for 12 years as a maid, similarly recalls being treated like family by Bill. (Ex. 24). She is grateful to Bill for keeping her employed during a recession, even though many other families terminated her services. With the money she earned working for the Mastros, Ewa (who came to the United States more than 20 years ago) was able to send her son to college. Ewa remains grateful to Bill for helping her pay for expensive and necessary dental work that she was unable to afford on her own. John Hart, the dentist who repaired Ewa's teeth, recalls how Bill, whom he knew from AA, came to him and told him about a "young woman who was down on her luck and needed help getting her life back together," but could not because of the terrible condition of her teeth. (Ex. 25). When Dr. Hart met with Ewa, he determined that she would need extensive dental work, including root canals, crowns, and fillings. Bill paid for all of the dental work, which Dr. Hart recalls as a "gesture of compassion that brought this woman to tears."

James Prendergast received unsolicited help from Bill during a health crisis for his wife, who was diagnosed with a brain tumor in 2006 and placed in a nursing home. (Ex. 26). Around the time of Bill's indictment in this case, the nursing home told James that his wife would have to leave the facility because her brain injuries, which "caused her to lash out at times," rendered her "too difficult" to care for. James could not afford to move his wife. After Bill and Mary Lou learned about James' predicament, James received a call from a neurologist and his wife was admitted to Lyndon Oaks Hospital. She was treated there for six weeks, after which the staff found another nursing home that could accommodate both James' financial condition and his wife's illness. James tells the Court that to this day, "he has no idea what financial burden or how much work it took for Bill and his wife to accomplish this because they would not mention it." Remarkably, James writes, Bill helped James and his wife even though Bill had recently been charged with a crime and faced an uncertain future himself. Even more amazing to James is Bill's "ability to do good things for people and look for absolutely nothing in return."

Tricia Leischman, a paralegal for the Federal Public Defender in the District of Oregon, met Bill in 1997. As she recounts to the Court, she believes that "acts of kindness define Bill Mastro's character." (Ex. 27). Tricia too will never forget "Bill's personal generosity" several years ago. Christmas time has always been difficult for Tricia, a single mother who does not receive any child support; usually there is no "extra money" for gifts for her children. A few years ago, after learning about Tricia's situation, Bill "took up a collection" and sent the money to Tricia and a friend of hers, another single mother. Tricia recalls that "it was the best Christmas present I ever received. My friend felt the same way – totally shocked and overjoyed. We talked on the phone we were both screaming we were so excited. We both rushed off to Target. My daughter and her kids had a wonderful Christmas – Santa was good to them!" Tricia

23

was inspired by Bill's thoughtfulness and intends to help someone in need when she is able to do so in the future.

Frank Kurucz, a Roman Catholic Priest, who met Bill in 1998 when he was assigned to the St. Alexander Parish in Palos Heights. He describes Bill as the "first one to reach out his hand when someone is in trouble." (Ex. 28). Pastor Kurucz writes about the time he asked Bill to help a friend of his, whose 43-year-old husband had just died from cancer and who could no longer afford to send their son to Marist High School. Without hesitation, Bill "paid a full year of tuition" and continued to help the family. Pastor Kurucz believes that "Bill is one of the most kindest and generous people I know." Additional letters are collected and attached to this submission as Group Exhibit C.

In addition to the personal acts of kindness described above, Bill has for decades provided generous and meaningful financial support to many schools, religious institutions, and charitable organizations, by:

- Donating more than $143,000 to the Edward Hospital Foundation since 1993 in support of programs that help patients and their families. (Ex. 29).

- Donating anonymously $50,000 to the Morgan Park Academy for a playground, and $100,000 to kick off the school's first capital campaign. (Ex. 30).

- Donating more than $7,000 to the Cystic Fibrosis Foundation. (Ex. 31).

- Donating $200,000 to St. Alexander's Parish in Palos Heights to build a new school building. (Ex. 32).

- Volunteering at the Toy Box Collection, collecting and delivering "truckloads of toys" to families in need, particularly in the inner city. (Ex. 33).

- Donating more than $176,000 to Catholic Charities from 2000 to 2015. (Ex. 34).

These donations alone total upwards of 40% of Bill's current net worth. (PSR ¶ 96).

### 2.    Personal Sponsorship of Hundreds of Recovering Addicts

Sober for 34 years, Bill has sponsored hundreds of men over the last three decades and currently sponsors 20 men.  Many of these men have written letters to the Court detailing how Bill literally saved their lives, and pleading with the Court to sentence Bill in a manner that allows these critical relationships to continue.

Bill's own sponsor, Frank Milos, a 78-year-old lawyer, who has been involved in AA for 44 years, tells the Court that if he were to list the "extraordinary number of profound good works attributable" to Bill—"including the dozens of alcoholics he has sponsored and continues to sponsor in AA"—his letter would be a novel.  (Ex. 35).  Frank met Bill in 1980 when Bill was only 28 years old, one year away from sobriety and about to embark on full-time work in the sports memorabilia industry.  Early in their relationship, Bill proved to Frank that he was a good man.  For Frank, there is no better example of this than Bill's decision to adopt a biracial baby over 20 years ago.  As Bill's sponsor, Frank had considerable influence over Bill's life decisions. Despite Frank's warning to Bill and his wife that the adoption would be challenging, Bill affirmed to Frank that they were "prepared to undertake these challenges and that their decision was about this little baby and what they could do for her for the rest of her life."  Likewise, when Frank implored Bill not to do volunteer work in dangerous Chicago neighborhoods because he feared for Bill's safety, Bill told Frank that "the looks on the people's faces when he held their hands" trumped his personal safety.

As an active AA participant for more than 44 years, Frank has met many people and has been asked on three prior occasions to write a character letter on someone's behalf.  On all three occasions, he declined to write the requested letter.  But in this case, Frank wrote the letter gladly and with deep faith in Bill.  In Frank's humble opinion, Bill "is not a threat to society and [] no

person or institution would benefit" from his incarceration; rather, "many individuals whose lives he continues to change every day would be lost without him."

Mike Wantiez, an engineering manager living and working in Chicago, is one of those individuals. (Ex. 36). In his letter, Mike tells the Court that "Bill Mastro saved my life and continues to be a guiding force as we walk through life together." Twenty years ago, Mike was suicidal, homeless, and an alcoholic; now he is an employed, married father of two. Mike credits Bill's help and sponsorship with making him the man that he is today—"a good son, brother, and friend." In 1993, Mike travelled to Chicago to meet a man that other people told him could help—Bill. Mike will never forget their very first meeting. Bill looked him in the eyes and said, "you don't have to live like this anymore." From that day forward, Bill assisted Mike down the path of sobriety by being his "rock" and by showing him how to be a kind and compassionate person. Today, as Bill faces the most difficult test of his life, Bill is still a "rock" of stability and even more of a role model to Mike. Not only has Bill candidly shared his "guilt, remorse, and shame" with Mike, but Bill has also "intensified his work in Alcoholics Anonymous and in his church and for other needy organizations."

Bill also saved Mitch Weiner's life. (Ex. 37). Mitch met Bill in 1988 at an AA meeting. Mitch struggled with sobriety until Bill became his sponsor in 1995. Mitch's sobriety was again threatened in 2008 and 2009, when he "suffered a number of set-backs," including the end of his marriage, which left him depressed and suicidal. Bill helped Mitch through this period: emotionally, spiritually, and financially. Bill guided Mitch through his contentious divorce, keeping him "reasonable and on track," so that Mitch's children did not get dragged into the battle. For Mitch, the "world is a much better place with Bill Mastro in it."

Dennis Parmley, a retired truck driver and welder, is "grateful for having a man like Bill Mastro in his life." (Ex. 38). He too credits Bill with "saving [his] life," and describes Bill as "a wonderful asset to the human race." Dennis met Bill in 1987 when Bill asked Dennis to join a football game that Bill and a group of men were playing. At the time, Dennis was "lost and spiritually broken"; it seemed to Dennis that Bill understood this on that very first day they met just by looking at him. For Dennis, though getting sober was not easy and there were many failures along the way, Bill "never gave up" on him.

Like Dennis Parmley, Paul Shepard noticed Bill's "special knack in which he can look at somebody and see the pain in their eyes if they are struggling." (Ex. 39). Bill became Paul's sponsor in 2002 and has played a "very integral part of [his] continuous sobriety." Over the years, Paul has looked to Bill to for spiritual guidance and believes his decision to have Bill sponsor him is one of the best he has ever made.

Gerald McAuley, a former "outlaw biker member of the Hells Henchman," also found sobriety and faith with Bill as his sponsor. (Ex. 40). Gerald met Bill in 1993 but did not gain his sobriety until 2001. For Gerald, getting sober was the 'hardest thing I have ever done in my life"—unthinkable without Bill's constant counsel and support. Gerald recalls how Bill "helped me take responsibility for my mistakes and learn from them." Equally important was that Bill taught "a spiritually bankrupt man to have faith and grow spiritually" by helping others. Today, Gerald sponsors many men and works at treatment centers. For Gerald, like Bill's many other sponsorees, Bill "is critical to our existence."

Carl Joseph Garber, a 42-year-old engineer and graduate of the University of Illinois at Champaign Urbana, tells the Court that "if it was not for Bill, I am not sure if I would be alive to write to you." (Ex. 41). A teenage alcoholic, Carl had multiple DUIs and drank so much that it

27

caused physical damage to his body and destroyed his relationships with family and friends. Carl met Bill in 2000. He was 27 years old, unemployed and "drinking myself to death." A friend told him to meet with a man named Bill Mastro, who had "saved his life." Carl recalls how when he first met Bill at his office, Bill "dropped what he was doing that day" even though he had never met Carl before. About that day Carl writes, "Bill was kind patient and honest. He told me about his struggles with alcohol. After spending just a few minutes with Bill (he spent the whole day with me) for the first time in my life I realized that there was hope for me that I could live without drinking again. I also believed that my life was worth living." Sober since 2001, Carl made amends with his family, and is now employed and able to help others achieve sobriety. He credits Bill's "passion for helping others" with saving his life.

Michael Ulbricht is grateful to Bill for saving his brother Don's life. Don, an alcoholic suffering from severe kidney damage, tried to kill himself in front of Michael. (Ex. 42). After this incident, Michael "found it too painful" to allow Don to keep living with him. Michael turned to Bill for help and asked him to sponsor Don. Bill provided Michael a place to live, rent-free, near the site of AA meetings. Bill then took Don to the meetings and encouraged his other sponsorees to bring Don as well. While Don is not yet in recovery, Michael is hopeful about Don's future because "he has someone like Bill Mastro in his life." Michael is "terrified to think about what would happen to Don if Bill Mastro is not a part of his life." Michael prays that Bill is sentenced in a manner that allows him to continue helping his brother Don and all the other men who depend on him.

Jason Salerno is another one of those men. (Ex. 43). Bill became his sponsor in 2011, during the heart of this investigation. Bill spent "uncountable hours of support" counseling Jason "without any expectation of anything in return." Importantly, before he publicly pled

guilty in this case, Bill admitted his mistakes to Jason in order to teach him "how to live an honest life." Like Bill's other sponsorees, Jason hopes for a sentence that will allow Bill to "continue his good work in the community."

Additional letters from the many men that Bill sponsors are collected and attached to this submission as Group Exhibit D.

### 3. Religious Conviction and Pilgrimages to Medjugorje

A devout Catholic since his conversion in 1999, Bill has committed himself to helping others in order to become closer to God. (Defendant's Version at 5). As Mary Lou explained in her letter, "Bill genuinely believes that God wants him to help the needy and this is what he does on a daily basis." (Ex. 2). The many letters written on Bill's behalf attest to this. Bill's commitment to helping others was further strengthened in 2003 when he attended a "life-changing" pilgrimage to Medjugorje, a Marian Shrine in Bosnia. (Defendant's Version at 5). Twelve years later, Bill has now sponsored and led trips to Medjugorje for hundreds of individuals, many of them suffering from illness or addiction. Through the pilgrimages, Bill became involved in orphanages and recovery centers in this war-torn region.

Svetozar Kraljevic, a Catholic priest ordained in Chicago but living and working in Zagreb, Croatia, was "deeply impressed" by Bill's assistance to orphans and refugees living in Bosnia. (Ex. 44). Father Kraljevic notes that every time Bill travels to Bosnia, he brings clothing and shoes for the orphans and refugees and encourages everyone he sponsors on the trip to bring these items, resulting in many generous donations. Bill also spends time counseling men, many of them refugees, in the drug rehabilitation center. Father Kraljevic recalls when Bill organized a program involving more than 600 volunteers to help clean up uncollected garbage that was becoming a dangerous health hazard to the community. Most remarkable to Father

Kraljevic is the occasion when that Bill and his wife paid for a lifesaving surgery for a Bosnian orphan in Chicago, A██ S██, who was then a 35-day-old baby born with a serious heart problem.

Dr. Noreen Salmon felt similarly privileged to write a letter on Bill's behalf, even though at the time she had known Bill for less than a year and was living with Stage IV colon cancer. (Ex. 45). Diagnosed with less than 24 months to live, Dr. Salmon dreamed of going on a pilgrimage to Medjugorje with her best friend. Bill made that dream come true. Bill ensured that Dr. Salmon, despite being very ill, was comfortable throughout the trip. He was also instrumental in getting Dr. Salmon "in front of one of the visionaries," allowing Dr. Salmon to leave "Medjugorje a different person."

Similarly, Bill funded three separate pilgrimages to Medjugorje for Mary Bonarigo, who passed away from breast cancer in 2006. Mary's daughter, Tiffany Sullivan, writes of the amazing "amount of compassion and kindness" Bill showed her family. (Ex. 46). In addition to paying for the trips, Bill "created a position" at Mastro Auctions for Mary after she found herself unemployed in 2003. Mary had just been diagnosed with breast cancer and did not have enough money to pay for her COBRA insurance payments. Working for Bill allowed Mary to "receive an income and vitally important group health insurance" so she could obtain and concentrate on her medical treatment. When Mary died, Bill continued to support her family by paying all of her memorial and funeral expenses, leaving Tiffany "eternally grateful" to Bill and "honored to know such an astonishing human being."

Patricia Franklin, who was Mary's close friend, feels the same way. (Ex. 47). As Bill's travel agent for the last 25 years, Patricia has planned Bill's many trips to Medjugorje and has witnessed his generosity in funding many other participants' trips, including Mary's. Patricia

will never forget how the trip to Medjugorje she went on with Mary and Bill allowed Mary to build "spiritual strength in confronting her diagnosis." Likewise, according to Patricia, Bill's offer of employment to Mary preserved Mary's "sense of dignity and purpose as she embraced the inevitable."

Bill took Daniel Alberts, a teacher living in Mokena, Illinois, to Medjugorje in 2007, during a difficult time in Daniel's life. (Ex. 48). Daniel "returned from this trip feeling renewed and more faithful," allowing him to continue his important educational work with adolescents in treatment. Likewise, Father Pat Murphy, a Catholic Priest at St. Elizabeth Seton Parish who "observed Bill's deep commitment to helping others" during the many years that he has ministered to him, will never forget the pilgrimage to Medjugorje that he went on with Bill in 2007. (Ex. 49). Father Murphy met four young men on the trip sponsored by Bill in need of a "critical lifestyle change." Bill mentored the men and served as a role model. Father Murphy proudly tells the Court that all four of the men have led successful lives since.

Sister Mary Clare, a nun from the community of Poor Clare Nuns, describes Bill as "a completely unselfish person." (Ex. 50). In addition to treating the nuns to flowers on Christmas, nice meals, and repairs to their van, Bill paid for airline tickets for Sister Mary Clare and several of the other nuns so they could visit Medjugorje. Without Bill's generosity, none of them would have been able to visit this "holy place to travel." According to Sister Mary Clare, "Billy Mastro is the real deal! He is a generous, devout, Christian Man who would give the shirt off his back to someone in need."

Mother Gabrielle Marie, another Poor Clare Nun, also believes that "Bill is a very good Catholic man who really lives his faith and shows good example to all around him." (Ex. 51). Over the years, Mother Gabrielle Marie has witnessed the many trips to Medjugorje that Bill

funded for the sisters in the monastery. She is also aware of the many individuals struggling with addiction whom Bill has taken at his own expense to Medjugorje, including her nephew, who was abusing drugs at the time. Mother Gabrielle is certain that the trip with Bill "inspired [her] nephew's great conversion, after which [her] nephew stopped using drugs." In all of the years she has known Bill, she "has never known him to ever turn away a needy person."

For this same reason, Michael McMahon, who met Bill during a very "turbulent" time in his life, has admired Bill since he met him 13 years ago. (Ex. 52). Michael witnessed Bill's devout spirituality and generosity when he accompanied Bill to Medjugorje. Before the trip, Bill instructed Michael and the others to pack lightly for themselves, but to bring additional clothing and necessities to share with needy orphans and others in need. Michael recalls that it was a "life changing experience" to see "the reactions on the faces of the children and women" who received these items from Bill. Equally inspiring for Michael was watching Bill assist the men in Medjugorje who were suffering from addiction. All of these observations have led Michael to conclude that Bill is "an ideal role model for me as a man, as a husband, and as a father."

Additional letters from individuals who traveled to Medjugorje with Bill are collected and attached as Group Exhibit E.

### 4.  Service to the Chicago Community

As the above letters reveal, Bill's compassion, kindness, and generosity have been constant throughout his entire sober life, dating back over three decades and well before the conduct in this case began.[5]  In an effort to make further amends for his conduct in this case, Bill sought to increase his work in the community even more, specifically with regard to his work

---

[5]  Bill has been a regular blood donor at the Heartland Blood Centers in Illinois since 1989, making more than 60 personal donations. (Ex. 53).

with The Catholic Charities of the Archdiocese of Chicago (CC), where he served on the Board for about 15 years, and the Brothers and Sisters of Love (BSL), an organization to which he has previously donated generously. As witnessed by his lifelong friend and confidant Tim Rivelli, "Bill's remorse and contrition have inspired him to throw himself more deeply into the service of others" by doing more "difficult" volunteer work with CC and BSL in an effort to reach the neediest members of the community. (Ex. 54). This work is vital and ongoing.

Kathy Donahue, the Senior Vice President of Program Development and Education at The Catholic Charities of the Archdiocese of Chicago, has written a letter to the Court "to express how critical Bill's presence is to the success" of Catholic Charities' Mobile Outreach Program. (Ex. 55). The Mobile Outreach Program is responsible for transporting homeless individuals in Chicago to shelters and warming centers during severe and dangerous weather. Ms. Donahue initially asked Bill for consultation and "ideas" in order to get the Mobile Outreach Program up and running. She knew he would be great benefit to this program given his "commitment to help the poorest and most ignored people living in the community."

For the last two years, every Tuesday from 3:00 p.m. to 11:00 p.m. or later, Bill drives a large van within an assigned area of Chicago to pick up and deliver homeless people to safe shelters. Bill does not just drive the van; he interacts with everyone respectfully, putting his guests at ease and inspiring other volunteers to treat them with dignity. He offers the guests sandwiches that he prepares himself and accompanies each guest to the door of the shelter, making sure that he or she is not afraid or uncomfortable. Recently, Ms. Donahue had the "honor" of riding with Bill in the van, leading her to conclude that his work with the "disenfranchised and the homeless" is truly awe-inspiring. Ms. Donahue observed how Bill has shown the occupants of the van "humanity and kindness, whereas most people are fearful of

them or treat them like they are invisible. Bill reaches out and treats them with respect, compassion, and dignity." For Ms. Donahue, "there is simply nobody like him when it comes to his level of commitment, empathy, and support"—indeed, Bill's absence from the program would create a "huge void." Ms. Donahue believes that "it would truly be a gift for Catholic Charities to receive Bill's services as part of his sentence."

Reverend Monsignor Boland, the President and CEO of Catholic Charities, agrees. (Ex. 34). He has known Bill for more than 14 years, observing Bill's transition from a board member and major financial donor to vital hands-on volunteer. Reverend Boland understands that most people are afraid or unwilling to work with the homeless because "it is difficult work, involving interacting with individuals often suffering from mental illness and in dangerous neighborhoods." Bill's "level of commitment to these individuals is truly inspiring." "Simply put," writes Reverend Boland, "there is no volunteer quite like Bill and the continued success of the Mobile Outreach Program is dependent on his unique participation in the program." Similarly, Reverend Gerald Kelly, the Associate Administrator for the Catholic Charities, describes Bill as a "remarkable human being" whose commitment to the Mobile Outreach Program is "unprecedented." (Ex. 56).

Brother Jim Fogarty, the Executive Director of the BSL, also prays for a sentence that will allow Bill to continue his "integral" work with the poor and disadvantaged. (Ex. 57). BSL is a non-profit organization ministering to residents in some of the poorest and most dangerous neighborhoods in Chicago. Brother Jim met Bill about ten years ago. At that time, Bill was an "enthusiastic financial supporter," donating thousands of dollars a year. This all changed after Bill's business closed in 2009. Bill met with Brother Jim and told him about a possible indictment, his depression, and his desire to "find some meaning for his life." Shortly thereafter,

Bill began working with Brother Jim one to two days a week ministering to residents of Cabrini Green, Back of the Yards, and Dearborn Homes. Brother Jim believes that Bill's care for Renee, a 55-year-old woman suffering from severe asthma, best exemplifies his level of humanity. Renee's asthma was so severe that it left her without any energy. Severely overweight and always tired, Renee rarely left her bedroom. Bill and Brother Jim visited Renee in the spring of 2010, after Renee suffered a severe asthma attack, in part due to the lack of air conditioning in her apartment. The next day, Bill bought two air conditioners and installed them in Renee's apartment. Brother Jim noticed that after this, Renee showed a newfound energy and zest for life, even getting an exercise bike. Bill shows this same level of compassion for all of the people he meets walking through the neighborhoods with Brother Jim. Given Bill's deep commitment to the poor, Brother Jim believes that Bill is a "much needed force" especially now, "as poverty and violence are destroying so many good people" in the communities BSL serves. After six years, the residents have come to depend on Bill's friendship, compassion, and kindness. Letters from several of the residents thanking Bill for his service are included as Group Exhibit F.

### D.    Physiological and Psychological Conditions and Necessary Treatment

Bill suffers from serious physiological and psychological infirmities that are well-documented and require continuous treatment. Following a childhood plagued by his mother's extreme physical and emotional abuse, Bill battled alcoholism for most of his adult life. (PSR ¶¶ 49-50, 74, 90); (Defendant's Version at 2). Though grateful for the opportunity to accept public responsibility for his transgressions, Bill's remorse and shame, exacerbated by relentless media attention, have caused him severe despair and social withdrawal—impairments that became so severe that he contemplated suicide. (PSR ¶ 71). He now suffers anxious, depressive, and obsessive symptoms, for which he receives psychiatric treatment and is prescribed multiple medications. (PSR ¶¶ 66, 70-72). Mary Lou still worries—when she has been at work all day

35

and cannot get in touch with Bill—that she will "come home to find him dead from suicide." (Ex. 2).

Bill also suffers from an acute, painful urological condition. That impairment is chronic and permanent in nature. Bill was forced to undergo surgery in August 2014, and received emergency medical intervention two months ago, in June 2015. Bill's physician has confirmed that his urological condition requires, and will continue to require, continuous and frequent treatment and "close office surveillance." (PSR ¶¶ 65-69).

### E.    Genuine Remorse, Acceptance of Responsibility, and Cooperation

Bill privately took responsibility for his conduct to members of the industry, members of AA, his family, and the community before pleading guilty. And, despite the anxiety of living with this investigation for more than seven years, Bill's desire to make amends for his conduct have never waned. Dr. Walter Whang, Bill's psychiatrist for the last six years, confirms this. In his letter to the Court, Dr. Whang states that he and Bill "discussed in great detail his feelings about how his conduct in this case has affected others, including his own family, business associates and friends." (Ex. 58). During their sessions, Dr. Whang observed Bill's struggle with "significant depressive symptoms" and deep shame for his conduct. This, in addition to Bill's "significant altruistic behavior" that "well preceded this investigation," led Dr. Whang to conclude that "Bill's remorse and desire to make amends for his conduct is genuine."

Bill's substantial cooperation in this case also underscores his genuine remorse and desire to make amends for his conduct. In July 2012, Bill met with the Government and provided extensive and valuable information concerning his own conduct. *See* Government's Memorandum in Support of the Proposed Plea Agreement (Doc. No. 79) at 2. During his interview, Bill candidly and fully explained the nature and extent of his actions and took full responsibility for them. *Id.* Bill also agreed to waive the statute of limitations with regard to

early shill bidding by him, which allowed the Government "to charge an execution of the scheme involving some of defendant's more egregious conduct," which included co-defendant William Boehm, sending an important "deterrent message to others in the auction industry." *Id*. at 14-15.

In 2013 and 2014, Bill again met with the Government for several hours, providing them with significant and extensive information regarding the conduct of others involved in the scheme. (PSR ¶ 22). Bill's cooperation preceded the guilty pleas of all of his codefendants in this case. AUSA Dollear confirmed to the Senior Probation Officer that Bill "has provided, and continues to provide, substantial assistance to the United States Attorney's Office with respect to the prosecution and sentencing of his codefendants." (PSR ¶ 129). To that same end, Bill waived his right to contest the Government's loss calculation for Guidelines purposes. (PSR ¶ 15).

Finally, Bill has already paid in full the statutory maximum fine of $250,000, more than double the recommended Guidelines fine of $100,000. Bill escrowed that payment in an account set up by counsel in April 2013, more than two years ago. (PSR ¶ 111).

## III. ADVISORY GUIDELINES CALCULATION

The Presentence Investigation Report ("PSR") calculates an advisory Guidelines range of 57 to 60 months, based on a total offense level of 25[6] and zero criminal history points.[7] (PSR ¶ 113).[8] Bill does not object to any of the Guidelines calculations reflected in the PSR.[9] The

---

[6] This calculation depends on a base offense level of 6, plus enhancements of 4 levels for victim impact, 4 levels for aggravating role, and 14 levels for a calculated loss of between $400,000 and $1 million. (PSR ¶¶ 27-36). Because Bill has personally accepted responsibility for his conduct and assisted the authorities by timely notifying them of his intention to plead guilty, he is entitled to a 3-level reduction, resulting in a total offense level of 25. (PSR ¶¶ 38-40).

[7] Bill has no criminal convictions or juvenile adjudications, resulting in a CHC of I. (PSR ¶¶ 41-43).

[8] Based on a total offense level of 25 and CHC of I, the advisory Guidelines range is 57 to 71 months. However, because the maximum term of imprisonment that may be imposed under the statute of conviction is 60 months, the effective advisory Guidelines range is 57 to 60 months. (PSR ¶¶ 112-113).

statute of conviction imposes no minimum term of imprisonment and authorizes a sentence of probation, which may include conditions of home confinement, work release, fine, restitution, and/or community service. *See* 18 U.S.C. §§ 3561(a)(2), 3563(b).

For the reasons set forth below, we respectfully submit that any Guidelines sentence would be far "greater than necessary" to achieve the goals of sentencing. The U.S. Attorney's Office and Senior Probation Officer agree: both reject the advisory Guidelines range as unduly severe, and recommend a below-Guidelines variance. The U.S. Attorney's Office is expected to recommend a sentence of 20 months' imprisonment. (PSR ¶¶ 112-113). The Senior Probation Officer, who spent considerable time investigating Bill's personal history and characteristics and the nature of his offense, recommends a below-Guidelines term of imprisonment of 12 months and a day, without any term of subsequent supervised release. (Sentencing Recommendation of Senior Probation Officer ("S.R.") at 1).

The only point of disagreement between the Government and the defense, then, concerns the size of the appropriate variance, and whether it is necessary to send Bill—a 62-year-old first-time, nonviolent offender with chronic health problems, who has accepted full responsibility for

---

*(Cont'd from previous page)*

9    The PSR calculates the advisory Guidelines range using the 2014 Guidelines Manual, the version in effect on the date of the scheduled sentencing. (PSR ¶ 26).

It is expected that the Sentencing Commission's recent amendments to the fraud Guideline will take effect on November 1, 2015, less than two-and-a-half months after Bill's sentencing. Those amendments will mitigate and refocus the fraud Guideline in several instructive ways. First, for the first time in the history of the Guidelines, the Commission adjusted the monetary table in 2B1.1 for inflation. Second, the Commission limited the definition of intended loss at 2B1.1, Application Note 3(A)(ii) to the pecuniary harm "that the defendant purposely sought to inflict," a more stringent standard. Third, the Commission revised the victims table in 2B1.1(b)(2) to specifically incorporate the concept of "substantial financial hardship" to victims as a factor in sentencing fraud offenders. That revision reflects "the Commission's conclusion that the guideline should place greater emphasis on the extent of harm that particular victims suffer as a result of the offense," rather than the number of victims. Amendment to the Sentencing Guidelines, April 30, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf.

his crimes, who poses no risk of future criminality, who devotes himself to doing good in the community and on whom numerous people rely for help—to federal prison at significant taxpayer cost.[10]  We respectfully submit that it is not.

* * * * *

In determining a reasonable sentence calibrated to the particular facts of each individual case, the sentencing court must look beyond the advisory Guidelines to the factors set forth in 18 U.SC. § 3553(a).  *See United States* v. *Dean,* 414 F.3d 725, 729 (7th Cir. 2005) ("Section 3553(a), unlike the Guidelines themselves after *Booker,* is mandatory.").  The Supreme Court has described that statute's parsimony provision—the instruction to "impose a sentence sufficient, but not greater than necessary," to accomplish the purposes of sentencing—as its "overarching" command.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  Those purposes include the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, or other correctional treatment.  *See* 18 U.S.C. § 3553(a)(2)(A)-(D).  The statute also directs courts to consider, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *Id.* at §§ 3553(a)(1), (3), (6).

"District courts enjoy broad discretion to fashion an appropriate, individualized sentence in light of the factors in 18 U.S.C. § 3553(a)."  *United States v. Warner*, No. 14-1330, 2015 WL

---

[10]  *See United States v. Warner*, No. 14-1330, 2015 WL 4153651, at *8 (7th Cir. July 10, 2015) (observing that the "real choice before the district court" was between probation and the government's recommended sentence, not the advisory Guidelines range).

4153651, at *1 (7th Cir. July 10, 2015). Although the Court must make a finding regarding the correct Guidelines range, it "must not presume that a within-Guidelines sentence is reasonable," *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011), or that a below-Guidelines sentence is unreasonable, *United States v. Jordan,* 435 F.3d 693, 698 (7th Cir. 2006). Further, as the Supreme Court has made clear, no "extraordinary circumstances" are required to support a variance from the advisory Guidelines range or to justify a sentence of probation. *Gall v. United States*, 552 U.S. 38, 47 (2007). Rather, in all cases, the sentencing court "must make an individualized assessment based on the facts presented" to determine a sentence sufficient, but not greater than necessary; the Guidelines calculation is but one input. *Id.* at 50.

An advisorgally sentencing range calculated under the fraud Guideline, USSG § 2B1.1, is *particularly* unworthy of strict adherence. The fraud Guideline dramatically overemphasizes monetary loss while failing to measure a host of other relevant mitigating factors, leading to sentencing ranges that substantially overstate offense seriousness. Indeed, district court judges, the United States Department of Justice, and the Sentencing Commission itself all have recognized that the fraud Guideline, driven disproportionately by an "inordinate emphasis" on monetary loss and the piling on of multiple overlapping enhancements, may generate overly severe sentencing ranges and should be reexamined. *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *see United States v. Schmitz*, 717 F.3d 536, 539-40 (7th Cir. 2013) (describing "factor creep" phenomenon resulting from the "three-fold increase in the number of specific offense characteristics . . . incorporated into the fraud guideline"). That is why advisory Guidelines sentences under 2B1.1 have been increasingly rejected by district courts across the

country.[11]  Indeed, *more than half* of all sentences imposed for federal fraud offenses, 54.9%, fell below the advisory Guidelines range last year.[12]

Here, all parties agree that Bill's advisory Guidelines range is far greater than necessary to accomplish the goals of sentencing, and all recommend a below-Guidelines variance.  As further discussed below, Bill's acknowledgement of guilt, genuine remorse, and substantial cooperation; his extraordinary record of charitable and civic good works and invaluable personal service to others; and the non-custodial sentences received by similarly situated defendants (some of whom pled guilty to shill bidding plus even more egregious misconduct) warrant a probationary sentence for Bill.  We respectfully submit that, in this case, a prison term would serve only to disrupt Bill's important good works within the community and waste taxpayer resources, while failing to accomplish any marginal deterrent effect.  We hope the Court will agree that probation is sufficient, but not greater than necessary, for Bill.

---

[11]   *See Adelson*, 441 F. Supp. 2d at 512 (describing advisory sentencing ranges under 2B1.1 as "patently absurd on their face"); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (describing advisory sentencing ranges under 2B1.1 as "a black stain on common sense"); *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (describing advisory sentencing range under 2B1.1 as, ultimately, "of no help"); *United States v. Farha*, No. 11-cr-115 (M.D. Fla.) (sentencing former CEO of WellCare Health Plans, Inc. to 36 months in prison following jury trial on Medicaid fraud charges despite Guidelines range of 121 to 151 months); *United States v. Cole*, 765 F.3d 884, 887 (8th Cir. 2014) (affirming as substantively reasonable a probationary sentence for conspiracy to commit mail and wire fraud, tax evasion, and conspiracy to commit tax fraud where Guidelines range was 135 to 168 months); *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Ovid*, No. 09-cr-216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010); *United States v. Ferguson*, No. 06-cr-137-1 (D. Conn.) (sentencing former CEO of a reinsurance unit of Berkshire Hathaway Inc. to 24 months' imprisonment following conviction at jury trial despite Guidelines range of life imprisonment); *United States v. Turkcan*, No. 08-cr-428 (E.D. Mo.) (sentencing first-time offender who caused loss of approximately $25 million to prison term of 12 months and a day), *aff'd*, 470 F.3d 33 (1st Cir. 2006).

[12]   U.S. Sent'g Comm'n, 2014 Sourcebook of Federal Sentencing Statistics, Table 27A, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2014/Table27a.pdf.  Of the 54.9% total below-Guidelines variances, 26.6% were government-sponsored and 28.3% were non-government sponsored.  *See id.*

**IV.    A SENTENCE OF PROBATION WITH A CONDITION OF RIGOROUS COMMUNITY SERVICE IS WARRANTED UNDER SECTION 3553(a).**

    **A.    An Individualized Assessment of Bill's Personal History and Characteristics Warrants a Non-Custodial Sentence.**

Because a defendant's record of charity and good works may justify a lenient sentence—indeed, a probationary sentence—it is common enough for white-collar defendants to seek mercy based on their purported generosity and character. As a result, sentencing courts may be skeptical, understandably, of white-collar defendants who pursue leniency through "checkbook philanthropy." Although that skepticism is warranted in some cases, it simply is not merited here. The 223 character letters presented to the Court attest to Bill's uncommon humanity and commitment to helping others—what the Senior Probation Officer describes as a "genuine sense of altruism" long predating the "instant criminal investigation." (S.R. at 2). These letters are written by men and women who have witnessed and been enriched by Bill's generosity and selflessness first-hand—family members and friends, business associates and religious clergy, fellow addicts in recovery and fellow volunteers. Taken together, the letters demonstrate that Bill's extraordinary, decades-long dedication to service exists at the core of who he is. The letters attest to the quiet way in which Bill serves others—never seeking credit or acclaim—and to his meaningful and selfless good works. We respectfully submit that the character revealed by Bill's charitable acts, as well as the genuine remorse evidenced by his acceptance of responsibility and substantial cooperation, merit leniency.

Last month, the Seventh Circuit Court of Appeals affirmed the probationary sentence received by Ty Warner, the billionaire creator of Beanie Babies who evaded $5.6 million in U.S. taxes by hiding assets in a Swiss bank account. *See Warner*, 2015 WL 4153651, at *1. Warner's record of charity was the "primary mitigating factor" that led the district court to impose a sentence of two years' probation and community service, rather than the custodial sentence of 46

42

to 57 months recommended by the Guidelines.[13] *Id.* at *1, *9. In particular, Warner—whose net worth at the time of sentencing was $1.7 billion—donated $20,000 to a stranger who required adult stem cell treatment for kidney failure; gave millions of dollars' worth of toys to the Children's Hunger Fund; designed a plush toy in Princess Diana's honor and donated $20 million in profits to her memorial fund; and gave $13 million to enable the acquisition and development of a park in Westmont, Illinois. *Id.* at *1, *4. All told, the defense estimated that Warner donated $140 million to charitable causes, or about 8% of his net worth.[14] *Id.* at *9.

In affirming the district court's below-Guidelines sentence of probation, the Court of Appeals credited several facts that also distinguish Bill's history of exceptional generosity. To begin, Bill's dedication to charity and good works goes back "many years"—decades, in fact—and is therefore credible and persuasive evidence of his character. *Id.* Furthermore, although Bill's generosity has been expressed primarily through personal hand-to-hand service, his record of financial giving is nonetheless exceptional. His lifetime financial donations—$200,000 to his

---

[13]   Numerous courts in other Circuits have also found that a defendant's exceptional record of charity and community service may warrant a below-Guidelines sentence, including a sentence of probation. *See, e.g.*, *United States v. Robinson*, Nos. 13-cr-436 (JLL), 13-cr-437 (JLL), 2014 WL 1400197, at *8 (D.N.J. Apr. 9, 2014) (affirming probationary sentences where advisory Guidelines range was 18 to 24 months based on defendants' commitment to charity and community service, as well as their strong family values and lack of criminal history); *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (en banc) (affirming probationary sentence, including 250 hours of community service, for income tax evasion where the executive director of Habitat for Humanity's Pittsburgh affiliate testified to defendant's financial contributions and personal involvement in the rehabilitation of several houses in the area, as well as to the expected benefit from defendant's court-ordered assistance to the organization's efforts to rebuild the Gulf Coast after Hurricane Katrina); *United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming probationary sentence with three months' home confinement for wire fraud where advisory Guidelines range was 18 to 24 months because defendant made an "isolated mistake" in the context of his entire life, which was otherwise outstanding and included devotion to family, community and church); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming three-month sentence for Medicare fraud conspiracy of more than $5 million based on, among other things, defendant's charitable work, community service, generosity with his time and support and assistance of others); *United States v. Cottingham*, 318 F. App'x 159, 161 (4th Cir. 2008) (per curiam) (affirming as substantively reasonable a six-month sentence for failure to collect and pay payroll taxes and tax evasion, based in part on the defendant's substantial community service and the outpouring of support for defendant).

[14]   The government asserted that Warner's donations should have been valued at $35.7 million, or about 2% of his net worth. *See Warner*, 2015 WL 4153651, at *9.

local parish for a new school building, $50,000 to rebuild a children's playground, $143,000 to the Edward Hospital Foundation, $176,000 to Catholic Charities, and untallied thousands for grocery gift cards, bus cards, and other items for impoverished Back of the Yards residents— total upwards of *40%* of Bill's current net worth. (PSR ¶ 96).

Most importantly, as discussed in detail above, Bill's service to others has always gone "further than simply donating." *Warner*, 2015 WL 4153651, at *9. To take but one example, back in 2002, Bill and his wife brought a young woman suffering from severe addiction into their home and raised her along with their own three children; she is now married with children, who regard Bill as their own grandfather. (PSR ¶ 93). Bill has also mentored and sponsored scores of recovering addicts through Alcoholics Anonymous since 1981; sponsored and paid for numerous spiritual pilgrimages to Medjugorje, a Marian shrine in central Bosnia; fed and transported homeless Chicago residents to shelters; delivered donated toys to needy inner-city children; and attended funerals to comfort grieving families who have lost loved ones to gang violence. (PSR ¶¶ 88-92). Indeed, he continues to serve others in all of these ways today, and he will continue to do so.

Beyond his truly exceptional dedication to charity and good works, Bill's deep remorse distinguishes him from the typical white-collar defendant. *See United States v. Howe*, 543 F.3d 128, 138 (3d Cir. 2008) (concluding that "a defendant's remorse at sentencing is a factor that may distinguish him from the universe of white-collar offenders"). As this Court is well aware, it is not unusual for a defendant to appear at sentencing unrepentant, showing no remorse and refusing to accept responsibility for his crime. *See, e.g.*, *United States v. Sloan*, No. 05-cr-1025 (RG) (N.D. Ill.), Sentencing Tr. 22:14-18 (Oct. 11, 2007) (stating that it was clear that the defendant felt that he had "been wronged and [did] not accept any responsibility" for his crimes);

*see also Howe*, 543 F.3d at 132 (describing as "inaccurate" the government's assertion that "most defendants, white-collar or otherwise, exhibit [remorse] at sentencing," and collecting cases where defendants demonstrated no remorse). In contrast, Bill stands before this Court extraordinarily humbled and contrite, "ashamed and angry with myself for behaving in a manner that as inconsistent with the way I have lived my sober life, practiced my religion, and instilled values in my children."[15] Moreover, Bill cooperated fully, participating in multiple proffers, timely entering a guilty plea, and providing substantial assistance to the U.S. Attorney's Office. (PSR ¶¶ 22, 129). Bill's sincere expression of remorse, and insight into the harm he has caused, merits greater leniency than accounted for in the standard acceptance-of-responsibility adjustment. *See United States v. Wachowiak*, 496 F.3d 744, 754 (7th Cir. 2007) (observing that a district court may give further weight to a defendant's remorse and cooperation, beyond the acceptance-of-responsibility adjustment, and affirming below-Guidelines sentence for child pornography offender based on defendant's character, remorse, and low risk of recidivism), *abrogated on other grounds by Nelson v. United States*, 555 U.S. 350 (2009).

Finally, the Court may consider Bill's physical impairments, mental and emotional health, and need for certain "medical care" when determining the sentence it believes appropriate under 18 U.S.C. § 3553(a). 18 U.S.C. § 3553(a)(2)(D) (mandating consideration of "the need for the sentence imposed … to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"); *see United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (remanding and instructing district court to consider defendant's arguments about his physical infirmities and advanced age); *Rita v. United States*,

---

[15]  (Defendant's Version at 1); *see also* (PSR ¶ 24 (quoting defendant's psychiatrist, Dr. Walter Whang, who notes that Bill "has discussed in great detail his feelings about his instant criminal conduct and how it has affected others, "'has shown a tremendous amount of remorse and shame in processing his conduct,'" and has demonstrated "genuine" "remorse and desire to make amends for his conduct")).

551 U.S. 338, 364-65 (2007) (Stevens, J., concurring). Suffering through a childhood disfigured by extreme physical and emotional abuse, Bill battled alcoholism for most of his adult life. (PSR ¶¶ 49-50, 74, 90); (Defendant's Version at 2). Bill now suffers anxious, depressive, and obsessive symptoms, for which he receives psychiatric treatment and is prescribed multiple medications. (PSR ¶¶ 66, 70-72). In addition, Bill suffers from an acute, chronic urological condition that required surgery in August 2014 and emergency medical intervention in June 2015. (PSR ¶¶ 65-68). Bill's physician has confirmed that his urological condition requires continuous and frequent treatment and surveillance. (PSR ¶ 69). A probationary sentence would facilitate the provision of this much-needed medical care to Bill.

In sum, the 223 letters submitted to the Court catalogue a lifetime of good works, pursued quietly and with humility. While "extraordinary" generosity is no longer required to justify a below-Guidelines variance, *see Warner*, 2015 WL 4153651, at *8 (quoting *Gall*, 552 U.S. at 47), Bill's selflessness and service to others have been nothing short of that. Bill's longstanding dedication to charity and personal service, coupled with his evident genuine remorse, confirm that his offense conduct was out of character, that he is extremely unlikely to commit any further crimes, and that he possesses a unique ability to improve the lives of other. Bill's personal history and characteristics counsel strongly in favor of a probationary sentence under Section 3553(a)(1).

### B. A Prison Term Is Not Necessary To Provide Adequate Deterrence or To Effectively Protect the Public.

We respectfully submit that the important goals of deterrence have already been served in this case. As the Government itself acknowledges, Bill's prosecution, conviction, and acceptance of responsibility have resonated throughout the industry and "provided a strong deterrent message to others." Government's Memorandum in Support of the Proposed Plea

Agreement (Doc. No. 79) at 3. That message has been heard loud and clear. For the reasons described below, a sentence of probation with a condition of lengthy and rigorous community service is sufficient to accomplish "adequate [general] deterrence to criminal conduct" under Section 3553(a)(2)(B). A prison term—imposed at a cost to the taxpayers of $30,621 each year[16]—simply is not necessary to achieve that important objective.

To begin, *no* kind of punishment is necessary to deter Bill from committing further crimes. *See* 18 U.S.C. § 3553(a)(2)(C). Bill's misconduct "was specific to a niche occupational industry." (S.R. at 3). He has been out of that industry for more than six years, and he will never return to it. His professional reputation has been severely and permanently damaged, and he has demonstrated sincere remorse for his crime. *Cf. United States v. Roth*, No. 05-cr-792-5, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) (imposing probationary sentence because defendant "present[ed] no threat of recidivism," had "shown obvious and sincere remorse for her crime," and the "publicity regarding her conduct has obviously caused her great embarrassment and humiliation"). Indeed, Bill's age and lack of criminal history alone make it highly unlikely that he will commit any further crimes. *See Warner*, 2015 WL 4153651, at *11 (observing that defendant "was 69 years old, had no prior criminal history, and posed no danger to society"); *United States v. Behrendt*, No. 08-cr-71, 2008 WL 4643380, at *3 (E.D. Wis. Oct. 20, 2008) (imposing probationary sentence based on defendant's age, physical condition, and lack of criminal record).

---

[16] According to 2014 data provided by the FBI, the U.S. Marshals Service, and the Administrative Office of the U.S. Courts, the average annual cost to supervise a federal defendant in the community after sentencing was $3,909, while the average annual cost to imprison that same person after sentencing was $30,621—roughly eight times more. *See* "Did You Know? Imprisonment Costs 8 Times More Than Supervision," June 18, 2015, available at http://www.uscourts.gov/news/2015/06/18/did-you-know-imprisonment-costs-8-times-more-supervision.

As Your Honor has explained, a custodial sentence may be necessary when "there is nothing this Court can do short of incarcerating [the defendant] that will keep him" from continuing to commit crimes. *United States v. Haywood*, No. 08-cr-1023-2 (RG) (N.D. Ill.), Sentencing Tr. 25:5-7 (May 2, 2013), Ex. 59. This plainly is not such a case. Unlike defendants who have committed violent or truly predatory crimes, no further punishment is necessary to prevent Bill—a 62-year-old first-time offender whose misconduct was limited to a business setting that he has long since left—from victimizing others in the future. In his own words, Bill simply hopes and prays that the Court will give him the "tremendous opportunity [to] devote the rest of my life to bettering the community and the lives of those in it." (Defendant's Version at 6).

More broadly, the Court of Appeals has recognized that a judge "should consider general deterrence but must also hand down an 'individualized' sentence." *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014) (quoting *Gall*, 552 U.S. at 50); *see also United States v. Brubaker*, 663 F.2d 764, 769 (7th Cir. 1981) ("Consideration of general deterrence is proper provided that it does not result in a mechanistic imposition of a sentence."). And while the effective deterrence of white-collar crimes may generally require "a credible threat of imprisonment," that objective "does not necessitate imprisonment in every case." *Warner*, 2015 WL 4153651, at *12.

We respectfully submit that the prosecution and conviction of Bill, the severe personal consequences he has already suffered, and the additional punishment of a probationary sentence with stringent community service and home confinement would adequately deter others within the auctions industry and the business community writ large. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (observing that the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the

defendant"); *United States v. Coughlin*, No. 06-cr-20005, 2008 WL 313099, at *6 (W.D. Ark. Feb. 1, 2008) (concluding that a sentence of probation and home detention for Wal-Mart's former Chief Operating Officer was "capable of deterring corporate executives like Coughlin, who cherish their freedom of movement and right of privacy, from engaging in conduct similar to Coughlin's"). This case has been the subject of relentless attention from both the trade press and the national print and television media. According to the investigating Special Agent himself, Bill's fall from grace has "already served" as a well-known "cautionary tale" within the auctions industry. (S.R. at 3). A term of imprisonment would not provide any marginal deterrence, and is not necessary to discourage Bill or others from committing similar crimes.[17]

### C. The Nature and Circumstances of Bill's Offense—Serious Conduct for Which He Has Accepted Responsibility—Are Consistent with a Non-Custodial Sentence.

Bill has pled guilty to committing mail fraud. This is no doubt a serious crime. Bill accepts full responsibility for his unlawful conduct and for the punishment his unlawful conduct deserves. In Bill's own words, "I have nobody to blame but myself." (Defendant's Version at 6). In advocating for a variant sentence, the defense in no way intends to minimize Bill's personal accountability or the seriousness of his crime.

There are certain aspects of the "nature and circumstances of the offense," however, that do contextualize and mitigate Bill's conduct. 18 U.S.C. § 3553(a)(1). First, the fraud in which Bill participated caused relatively small pecuniary losses to individual victims, who were for the

---

[17] Notably, there is considerable empirical evidence that while certainty of detection and punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 35 Crime & Just. 1, 28 (2006). Research regarding federal white-collar offenders in particular found no difference in the deterrent effect of probation versus imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (Nov. 1995); *see also Adelson*, 441 F. Supp. 2d at 514 ("even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders" (citing Richard Frase, *Punishment Purposes*, 58 STAN. L. REV. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. ILL. U. L. J. 485, 492 (1998)).

most part sophisticated and relatively well-off fellow collectors. As the Senior Probation Officer notes, there is no evidence that victim bidders "suffered irreparable losses"; to the contrary, and unlike the typical fraud, "victims actually gained" an authentic item of value and "might have spent the same amounts absent" the offense conduct. (S.R. at 2-3). Nor is there any evidence that victims, on average, experienced the kind of "substantial financial hardship" that the Sentencing Commission recently amended the fraud Guideline to weigh more heavily.[18] This amendment, which will take effect two-and-a-half months after Bill's sentencing, *see supra* note 9, reflects "the Commission's conclusion that the guideline should place greater emphasis on *the extent of harm that particular victims suffer* as a result of the offense," rather than the number of victims—a distinction that the United States Attorney's Office has likewise adopted in far more serious fraud cases before this Court.[19]

Furthermore, we respectfully submit that Bill's offense conduct, while wrong, did not characterize his business practice over more than 13 years, and should be viewed alongside his significant contributions to the industry and to collectors. As scores of the character witnesses attest in their letters submitted to the Court, Bill helped to transform the sports memorabilia hobby into a vibrant and professionalized industry, and pioneered authentication and disclosure

---

[18] *See* Amendment to the Sentencing Guidelines, April 30, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf (incorporating the concept of "substantial financial hardship" to victims as a factor in sentencing fraud offenders under 2B1.1).

[19] *Id.* (emphasis added); *see United States v. Trudeau*, No. 10-cr-886 (RG) (N.D. Ill.), Sentencing Tr. 44:3-8 (Mar. 17, 2014), Ex. 60 (arguing that because "we do not have people who have been defrauded to the tune of their life savings," the seriousness of defendant's $37 million fraud was mitigated, and advocating for below-Guidelines sentence); Government's Sentencing Memorandum at 13-14 (Mar. 10, 2014), Ex. 61 ("While $37 million is the proper measure of the loss under the guidelines, it may overstate the seriousness of the offense. Among other things, the guidelines are indifferent to whether defendant's crime caused many victims to lose a relatively small amount of money, as happened here, or whether defendant caused a smaller amount of victims to lose large sums, thereby causing those victims catastrophic harm and perhaps even financial ruin. Defendant's crime did not cause such harm, and, for that and other reasons, the Court may choose to impose a sentence below the advisory guidelines range").

safeguards that remain best practice today. Between 1996 and 2009, Mastro Auctions served tens of thousands of customers. It sold more than $300 million worth of *authentic* memorabilia and collectibles. It sold more than 100,000 lots, many of which included hundreds or even thousands of individual items of memorabilia. In addition to the relatively small average pecuniary impact, Bill's offense conduct touched a very small percentage of the auction house's total business: approximately 1% of the total lots sold by Mastro Auctions over 13 years, and a fraction of its customer base. Bill's misconduct, though it extended over a period of years, was not systematic or, as numerous witnesses attest, characteristic of his business practice.

We acknowledge and respect the eleven former customers of Mastro Auctions who have submitted victim impact letters to the Court during the past two years ago. (Doc. Nos. 90, 91, 112, 113, 114, 124, 146, 147, 150); (Supplemental Report to S.R.). As the Court is aware, this case has generated widespread publicity and media attention, even prompting internet posts encouraging former customers to write directly to the Court.[20] Respectfully, and without in any way diminishing the seriousness of Bill's offense, it is incumbent upon us as counsel to address some of the letters' unsubstantiated allegations and to correct basic factual errors and omissions.

To begin, though some of those letters concern alleged shill bidding at Mastro Auctions, many do not. *See* Doc. Nos. 90, 114, 150. Several do not even contain specific allegations of misconduct, by Bill or anyone else. *See, e.g.*, Doc. Nos. 124, 146; Supplemental Report to S.R. at 3-4. Certainly, these letter writers felt aggrieved by Bill's conduct. And we do not intend to

---

[20]    Specifically, in April 2013, New York attorney Jeffrey Lichtman posted on a prominent hobbyist website a solicitation encouraging self-identified "victims" to contact the Court, providing the Court's mailing address and the caption for Bill's case. (Ex. 62) ("please let the judge know via letter"). That attorney previously represented an individual in private civil litigation against Mastro Auctions and Bill, and has since publicly criticized Bill's plea agreement with the Government in the New York *Daily News* for not providing any monetary restitution to Bill's victims, some of whom the attorney represents. In short, at least some of these letters appear to have been submitted at the encouragement of an attorney with an apparent stake in this case.

minimize Bill's conduct, for which he has taken, and continues to take, full responsibility.  We simply observe that most of the letters submitted to the Court do not relate to Bill's offense conduct, convey allegations neither established nor relied upon by the Government and, in multiple instances, do not even allege any specific wrongdoing.

Moreover, several of the letter writers assume they were victimized by shill bidding because the items they purchased, or related items, subsequently depreciated in value.  But such allegations simply do not suggest, let alone prove, shill bidding.  Scott Joy, for example, writes that he has "no proof I was shilled but it sure feels like it" because some of the cards he purchased from Mastro Auctions have resold for "50-70% of what I paid."  (Doc. No. 113).  Mr. Joy does not identify the specific items in question.  But even accepting that Mr. Joy's purchases were subsequently resold at lower prices, that does not mean—or even suggest—that the original sales were affected by shill bidding.  Items purchased at auction reflect one person's idiosyncratic valuation; sometimes collectibles, like many other market goods, lose value.

Similarly, Richard Levy writes that he "feel[s] that it is likely that I was a victim of shill bidding" on the Jackie Robinson game-used bat that he purchased for $82,356 because *other* Robinson bats have since realized lower prices at auction; thus, Mr. Levy concludes, the price at which he purchased his bat must have been artificially inflated by shill bidding.  (Doc. No. 91).  Mr. Levy's feeling is inconsistent with the available evidence.  First, Mr. Levy's final bid on this item was actually a *ceiling* bid of $90,798, which means that Mr. Levy was voluntarily prepared to pay any price up to $90,798 for this bat.  But Mr. Levy was not "bid up" to his ceiling: he won the bat for $82,356.  Second, this specific bat—the only available "game-used" bat from Robinson's 1949 MVP season—had unique historical significance, which explains why it sold

for a higher price than other Robinson game-used bats available in the market.[21]  Third, Mr. Levy alleges that the value of his bat has not risen because a *different* Robinson game-used bat sold for $83,650 in August 2011.  But in fact, in July 2013, Mr. Levy's *exact bat* was resold for more than $156,000—approximately 57% higher than Mr. Levy's purchase price.

Steven Cummings also claims to have been a victim of shill bidding and requests a refund of the "over charges incurred during the shill bidding process."  Although he has never met Bill, he goes on to suggest that Bill suffers from a personality disorder and "major character defect."  (Doc. No. 124).  Like Mr. Levy and Mr. Joy, there is no evidence whatsoever that Mr. Cummings was a victim of shill bidding.  Just the opposite: like Mr. Levy, Mr. Cummings won several lots for *less than* the maximum prices he had voluntarily bid and was willing to pay.  For example, Mr. Cummings won a first-edition 19th-century baseball publication, for which he had placed a ceiling bid up to $10,454, for $4,875.  He won an early 20th-century baseball publication, for which he had placed a ceiling bid up to $25,286, for $17,270.  He won an autographed 1928 Ty Cobb biography, for which he had placed a ceiling bid up to $4,506, for $3,076.  And like Mr. Levy's bat, all of these items were ultimately resold at higher prices at auction.

Again, we offer these clarifications without intending, in any way, to minimize the seriousness of Bill's crime or to diminish Bill's acceptance of responsibility.  Bill apologizes to customers and colleagues in the industry for any harm he has caused them.  Given all of the publicity surrounding Bill's offense, as well as the solicitations on hobbyist message boards to contact the Court, *see supra* note 20, it is certainly understandable how it came to pass that

---

[21]  In any event, Mr. Levy's chart of comparators is inapposite: each bat's value is a product of its unique features—the season, the condition, the provenance—and it is illogical to allege that shill bidding must have occurred because one item sold for a higher price than a second, readily distinguishable item.

eleven former customers wrote to the Court to share their grievances. We respectfully submit that the hundreds of letters of support on Bill's behalf, scores of them written by former customers and colleagues, provide meaningful context for the eleven that the Court has received directly.

Finally, while Bill certainly profited from his offense, he was motivated less by greed than unhealthy competitiveness and a misguided sense of "'duty' to protect sellers from bids that were 'too low' for the 'real value' of their items." (Defendant's Version at 5). This is corroborated by the fact that the total amount of unexecuted final ceiling bids (that is, where the buyer purchased an item for *less than* his ceiling bid) was nearly $14 million—dwarfing the agreed-upon estimated loss figure here by an order of magnitude. Had Bill been motivated purely by greed, nearly $14 million of ceiling bids would not have remained unexecuted. Of course, Bill's crime is not mitigated by the fact that he did not commit a more severe one, and he was wrong to artificially increase the prices paid by any buyers. But he did not act primarily out of a desire to enrich himself—to the contrary, as several character witnesses attest, Bill gave away much of his net worth, and certainly any financial profit that he personally derived from this scheme, to others in need. *See United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting below-Guidelines variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle").

In sum, Bill's motive, as well as the relatively limited scope of his misconduct— measured in terms of average victim impact, as well as percentage of total sales and customers— is consistent with a non-custodial sentence.

**D.    A Non-Custodial Sentence Would Avoid Unwarranted Disparities With Similarly Situated—Indeed, More Culpable—Defendants, Including Those Recently Sentenced in This Very District.**

A sentencing court must consider the need to avoid unwarranted disparities among "defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6); *United States v. Panice*, 598 F.3d 426, 442 (7th Cir. 2010) (vacating and remanding for failure to give "meaningful consideration" to sentences of similarly-situated fraud offenders). This factor argues strongly in favor of a probationary sentence.  In short, *far more* egregious misconduct than Bill's has been punished *far less* severely than the Guidelines and the Government recommend here.  And we are aware of *no* reported case in which anyone has served prison time solely for shill bidding on authentic items.[22]

Shill bidding has traditionally been viewed and remedied as a private civil wrong.  For example, Ezra Dweck, the defendant owner of one of the nation's largest jewelry auction houses, directed his employees to place more than 232,000 shill bids totaling more than $5 million.  The defendant falsely promised "no-reserve" auctions, but gave his employees spreadsheets instructing them what bids they should place to drive up the final sales price.  He was sued for fraud by then-New York State Attorney General Andrew Cuomo.  To settle this civil matter, Dweck paid $400,000 and accepted a four-year ban for the online auctions industry.  *See State of New York v. EMH Group, LLC*, No. 404967/2007 (N.Y. Sup. Ct. July 24, 2007); Ex. 63 (Press Release, New York State Office of the Attorney General, Attorney General Cuomo Cracks Down on Internet Auction Fraud (June 7, 2007)).  Allegations of rampant shill bidding in

---

[22]    In citing these cases to the Court, we do not intend to minimize the scope of Bill's offense conduct, which involved more than shill bidding.  *See supra* note 2.  That said, and without in any way diminishing the seriousness of Bill's misconduct regarding the T-206 Wagner card and the 1869 Cincinnati Red Stockings trophy ball, we note that the offense conduct overwhelmingly concerned shill bidding on authentic items by Bill and others—misconduct that has never, so far as we have been able to determine, alone resulted in the imposition of a prison sentence.

hundreds of private auctions were similarly resolved with nominal civil fines. *See State of New York v. Baranovich*, No. 401698/2004 (N.Y. Sup. Ct. May 27, 2004) (defendant paid $10,000 to settle civil fraud complaint concerning shill bidding in 165 eBay auctions of sports memorabilia); *State of New York v. D. Lien, Inc.*, No. 401477/2004 (N.Y. Sup. Ct. July 22, 2004) (defendant paid $28,000 to settle civil fraud complaint concerning shill bidding in 106 automobile auctions); Ex. 64 (Press Release, New York State Office of the Attorney General, "Shill Bidding" Exposed in Online Auctions (Nov. 8, 2004)).

In the extremely rare instance where shill bidding has been prosecuted criminally, defendants commonly received probationary sentences. In *United States v. Fetterman, et al.*, defendants Scott Beach and Kenneth Walton placed shill bids in hundreds of eBay auctions through scores of fake accounts. The defendants also forged initials and signatures onto paintings to defraud eBay users into believing that they had been created by renowned American artists—more serious misconduct than at issue here. *See United States v. Beach*, No. 01-cr-105-3 (E.D. Cal.), Ex. A to Plea Agr. (Apr. 17, 2001); *United States v. Walton*, No. 01-cr-105-2 (E.D. Cal.), Ex. A. to Plea Agr. (Apr. 17, 2001). Facing an advisory Guidelines range of 18 to 24 months, both Beach and Walton received 9 months' probation. *See United States v. Beach*, No. 01-cr-00105-3 (E.D. Cal.), Sentencing Tr. 5:7-9, 8:22-24 (June 29, 2004); *United States v. Walton*, No. 01-cr-00105-2 (E.D. Cal.), Sentencing Tr. 8:22-24 (June 29, 2004).[23] Likewise, in *People of the State of New York v. Schuster,* the defendant owner of an auction gallery was prosecuted for criminal antitrust violations by the New York State Attorney General for placing shill bids in more than 1,100 auctions over a five-year period. Facing a statutory maximum of

---

[23]  A third defendant, Kenneth Fetterman, received a sentence of 46 months' imprisonment. However, unlike his codefendants Beach and Walton, Fetterman was convicted of money laundering and was also a fugitive from justice. *See United States v. Fetterman*, No. 01-cr-105-1 (E.D. Cal.), Sentencing Tr. 3:9-17 (June 29, 2004).

four years' imprisonment, the defendant was sentenced to five years' probation and $50,000 in monetary penalties. *See* No. 00660S-2004 (N.Y. Cnty. Ct. Oct. 7, 2004); *see also* Ex. 64. None of these defendants served *any* time in prison.

The overwhelming majority of collectibles fraud prosecutions have concerned the knowing sale of fake goods—forgeries sold as rare Picassos, or worthless jerseys sold as "game-worn" memorabilia. And even in those cases, defendants far more culpable than Bill have received probationary sentences. For example, in *United States v. Khan*, the defendant dealer paid an art restorer $1,000 to fabricate a Picasso drawing. She then knowingly sold that forgery as an authentic original for $2 million. Once the forgery was discovered by her victim, the defendant lied to the investigating FBI agent and told the art restorer to lie as well. *See United States v. Khan*, No. 10-cr-152 (C.D. Cal.), Ex. A to Plea Agr. ¶¶ 1, 7-8 (Apr. 27, 2010). Facing an advisory Guidelines range of 21 to 27 months' imprisonment, the defendant was sentenced to a five-year term of probation. *See United States v. Khan*, No. 10-cr-152 (C.D. Cal.), Sentencing Tr. 8:11-13 (Oct. 4, 2010).

Indeed, several defendants within this very District have been sentenced recently to terms of probation and brief incarceration for knowingly selling counterfeit goods as priceless collectibles—misconduct inherently more culpable than shill bidding. In one scheme, five defendants devised and participated in a conspiracy to sell worthless jerseys as valuable "game-worn" memorabilia. They altered the jerseys so as to appear to have been used in games by pro athletes—removing and replacing players' names and numbers, changing the shape of the jerseys, and adding patches and other identifiable marks. The defendants also issued false certificates of authenticity. For these crimes, Judge Reinhardt sentenced all five defendants to

probation or terms of imprisonment no greater than six months.[24]  Similarly, two art fraudsters were recently sentenced by Judge Gottschall to one- and two-year terms of imprisonment for distributing numerous counterfeit prints as genuine limited edition artworks signed and authorized by prominent artists, including Marc Chagall, Salvador Dali, Pablo Picasso, and Roy Lichtenstein.[25]

Finally, the industry's most notorious prosecution concerned the criminal price-fixing conspiracy between leaders of the world's two leading auction houses, Sotheby's and Christie's. Over a six-year period, the companies' chief executives, meeting in secret, colluded to fix sellers' and buyers' commission rates.  This conspiracy was estimated to have cost the auction houses' customers more than $100 million.  *See United States v. Taubman, et al.*, No. 01-cr-429 (S.D.N.Y.), Indictment ¶¶ 8-10.

Denying his guilt, the former chairman of Sotheby's, Alfred Taubman, proceeded to trial and was convicted.  At his sentencing, the court observed that Taubman "has continued a conspiracy of denial…. [H]e has neither acknowledged personal responsibility nor shown any remorse."  *United States v. Taubman*, No. 01-cr-429 (S.D.N.Y.), Sentencing Tr. 43:24, 44:4-6 (Apr. 22, 2002), Ex. 65.  For his crimes, Taubman was sentenced to 12 months and a day in prison, of which he served ten months.  Diana D. Brooks, the former President and CEO of Sotheby's, pled guilty and cooperated with the government, as Bill has.  Given her evident remorse and cooperation, Brooks received a sentence of three years' probation, including six

---

[24]  *See United States v. Gernay*, No. 11-cr-50072 (N.D. Ill.), Sentencing Tr. 25:20-21 (Oct. 25, 2013); *United States v. Oldridge*, No. 11-cr-50073 (N.D. Ill.), Sentencing Tr. 27:24-28:1 (Oct. 25, 2013); *United States v. Horne*, No. 11-cr-50074 (N.D. Ill.), Sentencing Tr. 31:4-5 (Oct. 25, 2013); *United States v. Wells*, No. 11-cr-50077 (N.D. Ill.), Sentencing Tr. 46:14-15 (Oct. 16, 2013); *United States v. Jensen*, No. 12-cr-50013 (N.D. Ill.), Sentencing Tr. 35:8-9 (Oct. 16, 2013).

[25]  *See United States v. Bengis*, No. 07-cr-521 (N.D. Ill.), Sentencing Tr. 38:18-23 (July 15, 2013); *United States v. Amiel*, No. 08-cr-09 (N.D. Ill.), Sentencing Tr. 23:6-11 (June 15, 2011).

months of home confinement, 1,000 hours of community service, and a $350,000 fine. *United States v. Brooks*, No. 00-cr-1084 (S.D.N.Y.), Sentencing Tr. 13:9-12 (Apr. 29, 2002).

In sum, we respectfully submit that *any* term of imprisonment would create unwarranted disparity between Bill and the numerous defendants who have received non-custodial sentences for far more serious crimes, including those who flooded the market with outright forgeries and who fixed commission rates for the world's two leading auction houses. The need to avoid unwarranted disparities counsels strongly in favor of probation for Bill.

### E. A Non-Custodial Sentence Would Constitute a "Substantial Restriction of Freedom" Sufficient To Punish the Conduct For Which Bill Has Accepted Responsibility.

In *Gall*, the Supreme Court observed that probation, "rather than an act of leniency, is a substantial restriction of freedom." 552 U.S. at 44; *see also Warner*, 2015 WL 4153651, at *11 (same, and affirming term of probation as "a sufficiently serious sentence"); *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) (recognizing that "[h]ome detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished"); *United States v. Brady*, No. 02-cr-1043 (JG), 2004 WL 86414, at *8 (E.D.N.Y. Jan. 20, 2004) (noting that probation is "a punitive measure"). Congress and the Sentencing Commission have similarly recognized that probation, "a sentence in and of itself," may constitute an appropriate alternative to incarceration that meets fully the statutory purposes of sentencing. USSG, ch. 5, pt. B, introductory cmt. (citing 18 U.S.C. § 3561). Probationers remain subject to "several standard conditions that substantially restrict their liberty," including restraints on their ability to associate freely or to leave the judicial district. *Gall*, 552 U.S. at 48; *see also Doe v. United States*, No. 14 MC 1412 (JG), 2015 WL 2452613, at *5 n.25 (E.D.N.Y. May 21, 2015) (describing the "myriad conditions of probation

that significantly impair [probationers'] freedom").  The court can also impose a variety of "discretionary conditions" to probation, 18 U.S.C. § 3563(b), and the violation of any condition can be grounds for revocation and the imposition of a term of incarceration.

Nor was probation intended by Congress to be an exceptional kind of punishment.  To the contrary, Congress directed more than three decades ago that the Guidelines should reflect the "general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994(j) (emphasis added).  Congress issued this directive to ensure that "prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984).  And true enough, at the time the Commission promulgated the original Guidelines, nearly *one-fifth* of first-time offenders who committed the *most* sophisticated and financially destructive frauds received probation.  U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 33 (1987).

Bill plainly is not a "violent and serious criminal offender" who poses "the most dangerous threat to society."  He is a 62-year-old first-time offender who has fully accepted responsibility for his crimes, and who will not commit any others.  Bill wishes only to make amends by continuing the charitable service to which he has dedicated his life.  A variant non-custodial sentence is sufficient to meet the goals of 18 U.S.C. § 3553, would constitute just punishment for the crimes Bill has admitted, and would in fact better serve the public good than

60

a wasteful prison term. *See Coughlin*, 2008 WL 313099, at *7 (noting that defendant's expertise and talents were "better put to use than wasted in the physical deterioration of unnecessary imprisonment"); *Warner*, 2015 WL 4153651, at *5 (quoting the district court's finding that "'society will be best served by allowing [the defendant] to continue his good works' outside of prison").

We therefore ask the Court to impose a probationary sentence with whatever conditions the Court deems appropriate, including a lengthy period of community service. Bill is prepared, of course, to undertake *any* program of community service this Court directs. Because Bill has already developed a deep relationship of service with The Catholic Charities of the Archdiocese of Chicago, which he has served for decades, we describe below one potential opportunity for continued community service based on the letter of support submitted by Kathy Donahue, Senior Vice President of Program Development and Education, for the Court's consideration. (Ex. 55).

Catholic Charities is an organization that provides food, clothing, shelter, and counseling to those in need in Chicago and its suburbs. Catholic Charities offers a comprehensive network of services that range from food pantries to mental health counseling, affordable housing, and senior services. Bill has been deeply involved in Catholic Charities' service programs for more than a decade. Beyond his significant financial donations to Catholic Charities, Bill has volunteered his time to help many in the organization's programs, mentoring and sponsoring veterans dealing with substance abuse and employment issues, and working with a street ministry active in communities plagued by gang violence. Bill participates in Catholic Charities' Mobile Outreach Program every Tuesday, riding in a van that transports homeless individuals to shelters and warming centers in severe weather. He prepares and brings turkey sandwiches on the rides to feed the people he helps, and tours the city's shelters with them in order to assuage

61

their fears about unfamiliar surroundings. He also installed awnings at one of those shelters to protect the homeless from extreme weather.

Were the Court inclined to order Bill to complete a program of community service as part of a probationary sentence, Ms. Donahue has confirmed that Catholic Charities needs and would welcome his "critical" continued participation in the Mobile Outreach Program and other programs serving the needy in Chicago: "We would also be very willing to work with the Court system as you direct to formalize and expand his work at Catholic Charities." (*Id.* at 1, 3). Under such a plan, Ms. Donahue could continue to supervise Bill's volunteer activities, and Bill could continue to serve in eight-hour shifts in the Mobile Outreach Program on Tuesdays in addition to any additional hours of community service ordered by the Court. Moreover, should this Court sentence him in a manner that permits him to do so, Bill would continue serving the homeless in Chicago's shelters, ministering to residents of Back of the Yards, and sponsoring fellow addicts through Alcoholics Anonymous.

## V.    CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a sentence of

probation, with whatever conditions the Court deems appropriate, including a lengthy period of

community service.

Dated:  August 6, 2015

Respectfully submitted,

Jim Walden
WALDEN MACHT & HARAN LLP
One Broadway, 6th Floor
New York, NY 10004
(212) 335-2031

Michael Monico
Barry Spevack
Jacqueline Jacobson
MONICO & SPEVACK
20 South Clark Street, Suite 700
Chicago, IL 60603
(312) 782-8500

*Attorneys for William Mastro*