UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 12 CR 567-1 |
| | ) | |
| WILLIAM MASTRO | ) | Hon. Ronald A. Guzman |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits its Response to Defendant's Sentencing Memorandum, docket entry number 184.

In this submission, the government asks the Court to sentence defendant WILLIAM MASTRO to a term of 20 months' imprisonment because it is the appropriate sentence in light of the sentencing factors set forth in 18 U.S.C. §3553(a). In his private life, defendant demonstrated, through his charitable work, that he is a person that knew right from wrong. Yet for seven years (from about 2002 to 2009) of his professional life - he opted to advance his own interests through a series of lies and using his power as CEO of the auction house to serve himself and defraud others.

While defendant was CEO of Mastro Auctions, shill bidding was pervasive and the exact extent of the shill bidding will never be fully known – because, in 2003, when defendant became concerned that his shill bidding would be discovered, he instructed an employee – and now co-defendant – to destroy the under bidder

1

records (which records are the primary evidence of the shill bidding) and kept right on shill bidding for years.

However, in his sentencing memorandum, defendant offers a statistical analysis in an effort to quantify the volume of shill bidding at Mastro Auctions during the seven years of the scheme – which he calculates, as quite small. Defendant's statistical analysis is flawed and of limited value, however, because defendant caused the under bidder records to be destroyed for auctions prior to 2007 (this includes records dating back to the 1990s when the auction house started operating). Presentence Investigation Report ¶ 12, 15. So, under bidder records (or records documenting the bids placed before the ultimate winning bid), which are the key records law enforcement used to identify and investigate shill bidding at Mastro Auctions are not available to law enforcement for approximately five of the seven year scheme (and for any year prior to 2007). Notably, in calculating the guidelines in his case, given the absence of records, the government has not held defendant accountable as part of its loss calculations for shill bidding in auctions prior to 2007 (even though defendant admitted in his plea that it occurred between 2002 and 2007). *Id.* ¶ 15.

Thus, in calculating its loss and investigating the shill bidding – the government has been handicapped by being limited to records from auctions dating from April 2007 to February 2009 - which amounts to approximately 12 of 36 auctions conducted during the scheme period. But, even in that limited time frame, there was shill bidding on over 1300 lots. And, as explained below, this shill

2

bidding took place largely after defendant learned in 2007 of an the FBI investigation– which would suggest that the volume of shill bidding was greater prior to 2007. While each shill bid did not result in an immediate significant financial benefit to defendant - at its core, it was done to advance defendant's own business interests at the expense of others. Whether he was cheating a bidder out of a certain sum or keeping a consigner happy with a protective bid – it was done to advance his own interest and as a fraudulent tool to grow Mastro Auctions into the largest auction house.

Defendant's undisputed Guidelines range is 57 to 60 months' imprisonment. *See* PSR ¶¶26-46, 113. The government seeks a below guidelines sentence here because: (1) the defendant continues to provide substantial assistance with the government's investigation and prosecution of the charged co-defendants in this case and for that reason, pursuant to Section §5K1.1(a), the government moves the Court to depart from the Guidelines and impose a sentence of 20 months' imprisonment; (2) mitigating information regarding defendant's history and characteristics, including his charitable activities and his family history; (3) the deterrent value in the memorabilia auction industry of having defendant—a long-time leader in the industry—take criminal responsibility for his role in shill bidding and the sale of certain altered sports memorabilia; and (4) given uncertainties in reaching the appropriate loss calculation under the guidelines in this particular case.

Accordingly, in light of the offense conduct and the § 3553 sentencing factors, including defendant's cooperation with law enforcement and the mitigation of defendant's family history and charitable works – a below guideline sentence of 20 months is warranted. Conversely, a sentence of probation, as requested by defendant, is not appropriate and will serve to send the wrong message that defendant's crime is not a serious one and that he was able to avoid taking full responsibility for his years of lies through unrelated good works.

## I.  Background[1]

At times between 2002 and 2009, defendant was the owner or Chief Executive Officer of Mastro Auctions ("the Auction House"). Defendant sold the company in 2004 but continued to serve as CEO. The Auction House accepted items, often sports memorabilia, from consignors and sold those items to bidders through auction. The Auction House held several auctions each year. The auctions were typically online, with bids placed electronically by customers of the Auction House. In connection with each auction, the Auction House caused catalogs to be sent across state lines to Auction House customers. According to the terms of the auction catalogs, the bidder who placed the highest bid at the conclusion of the auction "won" the item and purchased it from the consignor at the price set by the winning bid (the "hammer price"). Bidders paid a fee to the Auction House to

---

[1] For ease of reference, this section contains the facts agreed to as part of defendant's written plea agreement. *See* Docket Entry number 99. Moreover, these same facts are supported by the Presentence Investigation Report. *See* PSR ¶¶ 7-16.

purchase an item ("the buyer's premium"), and consignors were supposed to pay a commission to the defendant's company on items sold at auction ("the seller's fee").

At certain times between 2002 and 2009, defendant knowingly made, and caused to be made, materially false and fraudulent representations and concealed material facts in the Auction House catalogs, advertising, promotions, or other media. These misrepresentations deceived bidders into believing that defendant's company always conducted competitive auctions according to practices that applied equally to all auction participants, and deceived auction participants into believing that greater market demand existed for some items sold by the Auction House than actually was the case. In addition, defendant MASTRO, Doug Allen, Mark Theotikos and others at times engaged in practices designed to fraudulently inflate prices paid by bidders. Other times, defendant MASTRO, Allen, Theotikos and others engaged in practices designed to protect the interests of consignors and sellers, which had the effect of artificially inflating the prices paid by some bidders.

Defendant, Allen and Theotikos sometimes placed "shill bids," meaning fictitious bids placed without the intent to win the item, which had the effect of artificially inflating the price of an item in the auction. Defendant MASTRO believed that the more bidders that bid on a given item, the higher the price that item would realize. Defendant also believed that active bidding on an item attracted more bidders to place bids on a particular item, because bidders were interested in purchasing items that were sought after by others. Defendant also believed certain items and consignors needed protection from a sales price below an

item's estimated market value. Defendant understood that by placing shill bids on items that he did not intend to win, he stimulated bidding in the auctions amongst legitimate bidders who believed that they were bidding against other legitimate bidders, and not the auction house or consignor of the item. In addition to stimulating bidding and increasing the number of bidders, defendant acknowledges that at times the bids he, Allen, Theotikos and other employees placed inflated the price of items, resulting in bidders likely paying more for an item than what they otherwise would have paid.

For example, in approximately 2002, defendant placed shill bids to drive up the prices that a certain bidder, Individual T.N., paid for items that were being auctioned in the Auction House. Defendant repeatedly shill bid against Individual T.N. Defendant also shill bid against other individuals, including C.L. and C.D.

Defendant also had access to ceiling bids because of his position, and, in some instances, received ceiling bids directly from certain bidders who placed their bids with defendant. Allen also had access to ceiling bids because of his position. At times during the scheme, defendant and Allen used ceiling bid information to drive up the bids of certain bidders, by placing shill bids below the bidders' ceiling bids. Defendant and Allen placed shill bids knowing that their bids would be automatically exceeded and their bids would not win. For example, Allen had information that Individual C.L. placed a ceiling bid of $80,000 on a Mayo Football card set. Defendant observed as Allen, using a paddle belonging to Owner A, placed

shill bids on the Mayo Football card set knowing that his bids would not win and would trigger Individual C.L.'s ceiling bid.

Defendant placed, and caused or allowed others to place, shill bids using several accounts, including an account belonging to a friend of an Auction House employee, the Auction House's corporate account, employee accounts, and an account in the name of defendant's family member. Defendant intentionally concealed his participation in certain auctions and his shill bidding by using accounts other than his own.

For example, in the Americana Spring 2002 Auction, defendant had knowledge that Individual T.N. was interested in American type collectibles to add to his investment portfolio. Specifically, in the early 2000s, Individual T.N contacted defendant directly in order to place ceiling bids in the auctions. At times, Individual T.N. placed up to 100 ceiling bids through defendant depending on the auction. During these auctions, defendant used a shill account belonging to a friend of an Auction House employee to drive up Individual T.N.'s ceiling bids. Defendant placed shill bids on certain Americana items, among other items, with the intent that Auction House customers, including Individual T.N., pay more for their items than the customers otherwise would have paid. In or about May 2002, Individual T.N. purchased, among other items, a 1924 John W. Davis Jumbo Campaign Display Badge for $2,338 and a set of 1960 John F. Kennedy and Richard Nixon Campaign Posters for $2,205. Absent defendant's shill bidding, Individual T.N. could have won the items at prices less than what Individual T.N. ultimately paid.

Following the auctions, defendant caused invoices and winning lots to be mailed to Individual K.S., who was an associate and business partner of Individual T.N.

Defendant also was aware that Allen, Theotikos and other auction house employees placed shill bids using accounts not in their name. Specifically, Allen used an account in the name of Owner A to place shill bids. When placing bids using Owner A's account, Allen frequently said words to the effect of "I put [name] on that item," meaning that Allen had used Owner A's account to fictitiously drive up the price of an item.

At times, defendant, Allen and Theotikos ensured that when they placed a shill bid and that shill bid was the highest bid at the end of an auction, that item would not be purchased by the shill bidder. Instead, defendant, Allen and Theotikos sometimes canceled, or caused the cancellation of, the sale of the item. As a result, defendant, Allen and Theotikos had an advantage over legitimate bidders because they knew that if their shill bid was the winning bid on an item, the sale would be cancelled. This allowed defendant MASTRO, Allen and Theotikos to bid in the auctions without risk.

Defendant also knowingly permitted five consignors to place bids on the consignors' own items, using shill bidding accounts belonging to nominees of these consignors to protect the value of those items, which had the effect of artificially inflating the sale price of those items. Between 2002 and 2009, the five consignors placed hundreds of bids on items the consignors owned, using shill accounts. At times, defendant facilitated these consignors' use of shill bids. When these

8

consignors' shill bids were the winning bid for an item, defendant MASTRO sometimes directed Auction House employees, including mail room employees, to return the auction item to the consignor, rather than delivering it to the nominee who had "won" the item. At times, defendant waived fees due to the Auction House, including the hammer price, buyer's premium, and seller's fee. By waiving the fees, defendant acknowledges that he gave those consignors an advantage over legitimate bidders because defendant enabled those consignors to bid, and shill bid, in auctions without risk. At times where fees were imposed on a consignor whose shill account had won an item owned by the consignor, defendant MASTRO caused the consignors, not the consignor's nominee, to pay the fees associated with the transaction. Defendant directed Auction House employees, including Co-Schemer A, to modify the Auction House's records to charge the consignor, not the consignor's nominee, with fees associated with the purported sale of the auction item.

In October 2007, the Auction House published a "Code of Conduct." While defendant was not aware of the Code of the Conduct at the time it was published, defendant acknowledges that a customer who read the Code would understand the Code to apply to all auctions beginning in October 2007 and continuing forward. The Code of Conduct stated that access to "ceiling bid" information would be limited to one employee who would be prevented from bidding. At times after October 2007, the Auction House computer system allowed defendant and other employees with bidding privileges access to ceiling bid information.

9

The October 2007 Code of Conduct stated that the Auction House would disclose to customers if items were owned by the Auction House, its employees, or any affiliated parties. Defendant acknowledges that at times after October 2007, the Auction House failed to disclose items that were owned by the Auction House, its employees, and related entities, including items owned by a company affiliated with the Auction House called Historical Collectibles. Historical Collectibles was a company affiliated with the Auction House, and all of Historical Collectibles' merchandise, records, and other assets were maintained at the Auction House. Defendant was responsible for day to day operations of Historical Collectibles. Between approximately April 2008 and February 2009, defendant MASTRO knew that the Auction House failed to disclose ownership of over 1,000 items owned by Historical Collectibles and placed for sale through the Auction House. Beginning in late 2007 and continuing until at least late 2008, defendant MASTRO placed ceiling bids on several hundred items owned by Historical Collectibles, items that the Auction House effectively already owned. Defendant often, but not always, placed these ceiling bids early in auctions. Defendant MASTRO knew at the time he placed the ceiling bids that ceiling bids would automatically competitively bid against legitimate bidders. Defendant placed ceiling bids on Historical Collectibles items to stimulate bidding on those items, and also to protect the Auction House's investment in the items. At the time he placed those ceiling bids, defendant knew that legitimate auction bidders would be unaware that it was defendant, and not other legitimate bidders, who was bidding against them.

10

The October 2007 Code of Conduct stated that Auction House employees were prohibited from placing bids on items owned by the Auction House, other Auction House employees, or other affiliated entities or individuals. At times after October 2007, defendant MASTRO and other employees placed bids on auction items owned by defendant, the Auction House, Historical Collectibles, and other Auction House employees.

**False Representations and Concealment of Material Facts**

At no time did defendant inform Auction House customers that he engaged in shill bidding, or that defendant facilitated certain consignors' use of shill accounts. Defendant acknowledges that his failure to inform Auction House customers of this shill bidding activity was a material omission. As part of his duties as an Auction House executive, defendant, Allen and Theotikos also made, or caused to be made, false statements regarding the manner in which the Auction House's auctions were conducted. As defendant knew, each Auction House catalog represented that "items are sold to the highest bidder." At the time the catalogs were printed, defendant knew that the "items are sold to the highest bidder" statement was, at times, false. Specifically, defendant knew that in some auctions the highest bidder was actually placed by a shill account, and the items were not sold, but the sale canceled.

Consignment agreements entered into by consignors and the Auction House stated that a consignor, or agent of the consignor, was prohibited from bidding on an item tendered to the Auction House by the consignor. The consignment agreements stated that if the consignor violated this provision and had the highest

11

bid on an item or lot, the consignor would be required to pay the Auction House the commission and buyer's premium on the item or lot upon which the consignor was the highest bidder. The consignment agreements further stated that there were no exceptions to this provision. At the time these statements were made, defendant knew them to be false. Specifically, defendant knew that certain consignors used shill accounts to bid on items owned by the consignors, and defendant facilitated this practice. Defendant also knew that, at times, consignors were not required to pay the buyer's premium on lots on which the consignors' nominees were the highest bidder.

After the close of each auction, the Auction House posted the results of the auction on its website and also distributed the auction results through the mail to interested parties. Defendant was aware at the time they were posted that the results, at times, contained false and misleading information. In particular, the results represented that items had been sold when, in reality, defendant and certain consignors had placed the winning bid on multiple items and subsequently cancelled the sales. Defendant, Allen, Theotikos and other employees caused the items to either be returned to the original consignor, including the Auction House, or to be re-auctioned at a later date. As a result of posting false auction results, the Auction House falsely represented that it sold in excess of 99% of items offered for sale.

**1869 Cincinnati Red Stockings Trophy Ball**

In approximately December 2006, defendant contacted Individual C.L., and told Individual C.L. that an 1869 Cincinnati Red Stockings trophy ball, which was associated with a collection of trophy balls that Individual C.L. had previously purchased from the Auction House, was available for sale. At the time defendant contacted Individual C.L., defendant and Allen were aware that the 1869 Cincinnati Red Stockings trophy ball had been returned to the Auction House by Purchaser A, following laboratory testing conducted on the trophy ball. Defendant and Allen were aware, based on the laboratory results, that the trophy ball contained paint which had been manufactured after World War II, thereby calling the item into question. Defendant MASTRO did not, at any time, inform Individual C.L. about the laboratory testing. Allen was aware, based on conversations with defendant, that defendant did not inform Individual C.L. of the laboratory results when he sold him the trophy ball. Defendant acknowledges that the existence of the laboratory testing was material information that should have been disclosed to Individual C.L. On December 27, 2006, defendant sold the 1869 Cincinnati Red Stockings trophy ball to Individual C.L. for approximately $62,000.

**T206 Honus Wagner Card**

In approximately 1986, defendant purchased a T-206 Honus Wagner baseball card ("the Wagner Card"). When defendant purchased the Wagner Card, the Wagner Card contained bowed borders, causing the card to be shaped like a football. Defendant personally cut the side borders of the Wagner Card using a

13

paper slicing machine. Defendant MASTRO sold the Wagner Card in approximately 1987, and failed to disclose that he had altered the Wagner Card by cutting the side borders. In approximately 1991, defendant worked with a New York auction house to auction the Wagner Card. While participating in the New York auction, defendant failed to disclose that he had altered the Wagner Card. In approximately 1992, defendant was aware that the Wagner Card had been submitted to a company that assigns numerical grades to baseball cards based on the condition of the cards. The Wagner Card was the first baseball card to receive such a grade. Based on industry standards in place today, defendant acknowledges that had it been known that he altered the Wagner Card, the card would not have been eligible to receive a numerical grade. Defendant MASTRO acknowledges that a card with a grade is typically valued higher than a card that has been altered and is therefore unable to be graded. The Wagner Card was graded an 8 out of 10.

In approximately 2000, defendant participated in another auction of the Wagner Card. The Auction House, in conjunction with a partner auction house, auctioned the Wagner Card for in excess of $1 million. During the 2000 auction, defendant again failed to disclose that he had altered the Wagner Card.

On numerous occasions, defendant made public statements regarding the Wagner Card during which he denied making any alterations to the Wagner Card. These statements were false, as defendant had altered the Wagner Card by cutting its side borders.

14

Between 2002 and 2008, the Auction House advertised in various media, including on its website, in catalogues, and elsewhere, that the Auction House had participated in the sale of the Wagner card. This advertising distinguished the Auction House from other auction houses and was used to attract and retain customers.

The government agrees that the conduct related to the Wagner Card did not involve any loss for purposes of calculating the sentencing guidelines.

Defendant admits that he intended to defraud the victims of the scheme, namely, customers who believed that they were placing competitive bids against other legitimate bidders and who, as a result of defendant MASTRO's shill bidding, should have paid less to win auction items than what they paid.

## II.    The Correct Guidelines Calculation Is 57 to 60 Months.

Although the Guidelines are advisory, the Supreme Court has stressed that the district court must treat them as "the starting point and initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). As such, the district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation of any variance from the guidelines range. *Id*.

There is no dispute between the parties with respect to the guidelines calculations set out in the PSR. PSR ¶¶ 26-46. Namely, it is agreed that defendant warrants a criminal history category of I, and an offense level of 25 (which includes enhancements for loss, number of victims, and leadership role in the offense) and

15

that the correct guidelines range for defendant is 57 to 60 months' imprisonment. *Id*.

### III. Government's Motion Pursuant to Section § 5K1.1(a) Based on Substantial Assistance to Authorities

Pursuant to Section § 5K1.1(a) and defendant's continued full and truthful cooperation, the government asks the Court to impose a below guideline sentence. Defendant has provided the government substantial assistance in the investigation and prosecution of the defendants charged in this case. First, defendant was prepared to testify against co-defendant William Boehm, who was scheduled to go to trial and defendant's testimony was critical to the government proving the charges against Boehm. In the end, Boehm pled guilty shortly before trial and defendant's cooperation and anticipated testimony was likely a critical factor in Boehm's pleading guilty. Moreover, defendant provided information about the offense conduct at Mastro Auctions and the role of each of his co-defendants in the scheme. If necessary, defendant is prepared to testify at the sentencing hearings of his remaining co-defendants. In short, defendant has provided substantial assistance to the government and for that reason, the governments asks the Court to sentence him to a sentence below the guidelines range and impose a sentence of 20 months' imprisonment.

### IV. A Sentence to a Term of 20 Months' Imprisonment is the Appropriate Sentence under the Section 3553(a) Factors.

The framework for determining an appropriate sentence is set forth in 18 U.S.C. § 3553(a), which requires the Court ensure the sentence imposed properly

16

considers, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence, and (5) the need to avoid unwarranted sentencing disparities.

Considering these factors, along with the advisory Sentencing Guidelines, the government recommends a sentence of 20 months' imprisonment. Each of these factors is discussed in below.

### Nature and Circumstances of the Offense, and the Need to Reflect the Seriousness of the Offense

The defendant's involvement in shill bidding, his concealment of the shill bidding, and selling altered memorabilia is a serious offense. The long-running and systematic nature of the scheme undermines confidence in the auction house and sports memorabilia industries, and calls into question the true value of merchandise. As defendant correctly notes, the actual financial harm to any individual victim was limited, they received the items they won, and at times, through the use of ceiling bids, victims expressed a willingness to spend the additional money for an item they wanted at auction. However, in this case, the intended loss was much greater. The parties agree that through shill bidding the defendant's intended loss was hundreds of thousands of dollars and between $400,000 and $1,000,000. PSR ¶ 15; *See* Government's Version at 15-24. In other words, this is the amount that the defendant intended to drive up the auction prices through shill bidding.

17

While defendant is correct that bidders were not cheated out of huge sums by being duped by defendant and his co-defendants at auction to pay more for an item than necessary and ultimately received the item they bid on at the auction – it was still driven by fraud and cheated (or attempted to cheat) some bidders out of money. And, regardless of the amount, using his position and power as CEO to steal money from bidders and fraudulently drive up auction prices is still a serious offense. Defendant notes that many of the victims of his scheme were sophisticated and financially well off – however, that is with the benefit of hindsight. At the time he cheated these victims - it is unlikely defendant knew their financial means.

Additionally, the offense is serious because it causes the true value of certain auctioned merchandise to be called into questioned. The auctions were falsely advertised as fair with items going to the highest bidder. And, when concluded – auction results were shared and falsely showed that 99 percent of items were sold. Certainly, these auction results, which were at times false, would be consulted as a tool in the industry to determine prices for future transactions on the same or related merchandise – much like a person using prior comparable home sales to determine the value of a home. However, given defendant's seven year scheme, which often inflated the ultimate sale price of items or made it falsely appear that items were sold for a certain value when in reality they just went back to the consignor– these results, have to be called into question going forward by collectors and investors. Moreover, the auction results prior to 2007 must be particularly

scrutinized because the exact scope of the shill bidding cannot be fully known – as those records were destroyed.

As defendant points out, the motive for the offense cannot be chalked up to simple greed because the immediate financial incentive of cheating a bidder was not a windfall to defendant. However, through shill bidding defendant intended to drive up prices hundreds of thousands of dollars – which is no small sum. *See* PSR ¶ 15. Additionally, this offense seems to be largely driven by defendant's desire to develop Mastro Auctions into the biggest and the most successful auction house in the industry. As a result, instead of letting the auction processes dictate the value of an item, which might have been less than a consignor or defendant believed appropriate – defendant used shill bidding to set the value he felt appropriate. This largely meant using shill bids to falsely create bidder interest in an item, drive up the ultimate winning bidder, or to protect a consignor from having an item go for too low a price. In the end, defendant injected shill bidding to advance his own interest in promoting the auction house as the premiere auction house that sold a high volume of items at high values. In the end, defendant's ultimate goal was to beat the competition and garner more business for his auction house and in the end, more money for him.

Defendant's offense is also serious because he was the CEO of the auction house for the entire scheme period. He had the authority and power to control how the auction house operated. He opted to use this power to take a hands-on role to promote shill bidding and to cover it up. For instance, around 2001, defendant

19

instructed co-defendant Bill Boehm, who was employed at the auction house as an information technology employee, to get defendant an unused bidder account that he could use to make shill bids. *See* Docket Entry Number 145 (Boehm Plea Agreement) at 3. Boehm complied with defendant's request and provided defendant the account of Individual F.D. – an individual Boehm knew never used his account to bid in auctions. *Id.* Defendant then used this account to make shill bids. *Id.* at 3-4. In 2003, defendant wanted to conceal his shill bidding and instructed Boehm to destroy under bidder records for Individual F.D. as well as historical under bidder records. *Id.* at 4. Defendant further instructed Boehm to destroy under bidder records in future auctions. *Id.* Defendant continued to shill bid in auctions - he just wanted to make sure that the evidence was destroyed. PSR ¶¶8,9, 12, 15, 33. Defendant's efforts to get a lower-level employee involved in the shill bidding and instructing that same employee to destroy the evidence – further add to the severity of defendant's offense.[2]

### History and Characteristics of Defendant

With respect to defendant's history and characteristics, the government notes that several of defendant's history and characteristics reflect positively on him, for

---

[2] Notably, in his sentencing memorandum, defendant addresses Richard Levy's claims that he was the victim of shill bidding by defendant. Docket Entry Number 184 at 52-53. Defendant refutes Mr. Levy's claim by stating that Mr. Levy paid less than his ceiling bid. *Id.* However, this does not show that Mr. Levy was not the victim of shill bidding. Instead, it is impossible to know whether Mr. Levy was the victim of shill bidding because the under bidder records for the relevant auction were destroyed by defendant.

example, his lack of a criminal history; his wife and children are standing by and supporting him; and, as detailed in the PSR, defendant was and is a devoted father and gives of his time and money to charitable endeavors.

As reflected in the PSR, defendant's childhood was marked by physical and emotional abuse, and as an adult, he abused alcohol and drugs.  PSR ¶¶ 49, 73-80. Defendant has been sober since 1981.  PSR, ¶ 74.

Defendant overcame these obstacles to graduate college and become very successful at business – ultimately owning and operating Mastro Auctions. *Id*. ¶¶ 74, 86.  Defendant's offense, which ran from 2002 to 2009, was not one committed out of any financial hardship or necessity.  Starting in 1996, defendant made approximately $41,000 a month through Mastro Auctions.  *Id*.  In 2004, defendant sold Mastro Auctions to another company for $5 million (but he only received about $3.5 million of that amount).  *Id*.  He remained as CEO after the sale and made approximately $500,000 a year between 2003 and 2009.  *Id*.  Moreover, during the charged scheme defendant lived in a six-bedroom home in a suburb of Chicago, now valued at $600,000.  *Id*. ¶¶ 62, 96.  Even though defendant has been unemployed since 2009 – he remains a wealthy man.  His estimated net worth is approximately $1.3 million.  *Id*. ¶¶ 85, 96.  And, this amount does not include approximately $2.5 million in trust accounts set up by defendant for the benefit of his family.  *Id*. ¶ 106. Thus, defendant did not need the money he obtained from driving up bidders at auction– but instead appears to have been driven by a perverse desire to be the best and beat out the competition at any cost.

21

Defendant has committed his financial resources and his time to a number of charitable causes. PSR ¶¶ 87-93. His charitable activities are significant and have made a real difference in the lives of many. While committing the fraud, defendant was doing good works for a number of third parties. And, defendant acknowledges that through these many good works- he was likely, in part, trying to make up for the wrong he was committing at the auction house. *See* Defendant's Version of the Offense, at 6.

While the government acknowledges the significance of the many good works defendant has done on the behalf of others and that these efforts warrant a below guidelines sentence - a 20 month term of imprisonment is still the appropriate sentence. To impose a lesser sentence, such as probation, would suggest that defendant's decision to commit himself to charitable ventures – rather than ending the fraud - was somehow a valid one. When in reality good works for certain people does not excuse defrauding others. *See United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) (Charity is not a "get-out-of-jail card." ).

In seeking a probationary sentence, defendant directs the court to his role as a pioneer in the sports collectible industry, who helped legitimize the hobby and the integrity of the industry. Docket Entry 184 (Defendant's Sentencing Memorandum) at 7-14. While the government does not dispute that defendant was a pioneer and leader in the industry, it questions the direction of that leadership. Defendant manipulated auctions for seven years, which at a minimum fraudulently manipulated the value of items in the industry. Defendant personally altered the

Honus Wagner card in the 1980s, which in 2000 sold for more than $1 million dollars, and lied about it for years – despite being involved in the sale of that same card.   Docket Entry Number 99 (Defendant's Plea Agreement) at 12-13.  When the Wagner Card was the first card in the industry to receive a numerical grade – defendant stood silent while it received an 8 out of 10, while under today's standard the card would not be eligible to receive a numerical grade.   *Id*.   In the end, consistent with his drive to make his auction house the biggest and best, defendant used the auction house's involvement in the sale of the Wagner Card to market his auction house over other companies – with no mention that the card was altered.   *Id*.

Additionally, in his sentencing memorandum, the defendant cites sources identifying him as a leader in pressing the authenticity of memorabilia items and serving as a "trailblazer in legitimizing the sports memorabilia industry."   Docket Entry 184 (defendant's sentencing memorandum) at 10.   This argument is undermined by defendant's history with the Wagner card explained above. Moreover, during a covert May 6, 2008 recording of defendant and a confidential witness made at the instruction of law enforcement, defendant expressed a disinterest in authenticity.  More specifically, defendant stated:

> Defendant:   Second of all, I wanta sell stuff. I'm running a business here.
>
> CW:   Yeah, but . . .
>
> Defendant:   . . . I really don't give a shit if the stuff's real or not.  Okay. I don't care if its trimmed.  I don't care if it's real.  I, if I look at it and I think it's real.  I want the authenticators to look at it and think it's real. You think that all these PSA

> cards were auctioning are, aren't unaltered. They're all
> altered. The alternation going on, it is unbelievable in our
> hobby right now. Okay. There's not a sheet that gets
> auctioned off that isn't cut up. Every sheets getting cut up.
> Goudies sheets, Diamond Star sheets, basketball sheets,
> every sheet you see in the auction is being bought by
> someone who is cutting them up.

Moreover, in mitigating defendant's involvement with the Wagner Card,
defendant states that the "Wagner card remains one of the most valued items of
sports memorabilia, having resold since these allegations became widely publicized
for its highest price ever." Docket Entry 184 at 8, note 2. Defendant is correct and
in 2007, the Wagner card sold for over $2 million. However, during the same May 6,
2008 covert recording of defendant made at the instruction of law enforcement,
defendant admitted that he cut the card and made clear he thought it was
overvalued –which is notable because at the time, defendant had not disclosed to
anyone that he cut the card. More specifically, defendant stated:

> Defendant: The Wagner, the Wagner cards been trimmed on the
> borders, sold for 2 and a half million dollars. You wouldn't
> want that, that card? If somebody came to you and said to
> you [CW] here's the Wagner Card . . .
>
> CW: Yeah
>
> Defendant: it's a PSA holder, you don't want that card? I do. I just
> don't want it for 2 and a half million dollars. Okay. I want
> that card. I love that card. Okay. And I'm the guy that
> did it. I'm the guy that did it. And I want that card.
> What would I pay? Million and a half bucks. I'll write the
> check tomorrow. Somebody can bring that card, flop it on
> my desk. I'll write the check for million and a half bucks.

Defendant seems to acknowledge that the card is over-priced, but at that time, defendant was the only one who knew that the card had been altered.

### The Need to Afford Adequate Deterrence, Promote Respect for the Law and Provide Just Punishment for the Offense

Defendant's decision to cooperate with authorities in disclosing his own criminal conduct and the conduct of others, including his co-defendants, shows that he has a respect for the law.

However, this decision needs to be balanced with the fact that defendant participated in the scheme for seven years and had multiple opportunities to end the fraud and did not. For instance, in 2003, he became concerned about his shill bidding. Rather than stop the practice – defendant instructed Boehm to destroy the records and continued with the shill bidding. Later, in 2007, after Boehm was confronted by FBI agents and lied – Boehm called defendant and let him know that Boehm "took care of it." Docket Entry Number 145 (Boehm Plea Agreement) at 5. Again, instead of stopping after learning of the FBI investigation, defendant continued with the fraud scheme – which demonstrates little respect for the law.

In addition to probation, defendant paid the maximum statutory fine of $250,000 and asks the Court to impose lengthy period of community service. However, as to the fine, it is not much of a penalty for his crime given his extreme financial success and his current net worth. As the probation officer stated – paying the fine "has not caused him a demonstrable financial hardship." Sentencing Recommendation at 3. Similarly, sentencing defendant to community service is not

25

a significant consequence – as he enjoys community service and is already doing community service.  In other words, it would not serve as meaningful consequence for the crime to defendant.

While the government recognizes that defendant has largely removed himself from the industry and seems unlikely to commit additional crimes.  The need for general deterrence in this case is significant.  While defendant's scheme of using shill bids is novel – cheating to gain an advantage is not.  This was a crime of opportunity.  As CEO, defendant had more information than the bidders and used it to his advantage and their detriment.  Ultimately, the deterrence message that needs to be conveyed is that regardless of industry or position, those that cheat others and use inside information to their own advantage will be met with significant consequences.  This deterrent message would be lost if the CEO of a company that oversaw a seven year scheme and destroyed records related to the scheme was sentenced to probation.

Moreover, because so much information is controlled by the auction house this type of crime is very difficult to detect – a consideration that also weighs in favor of the need for general deterrence here.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994)("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase expected benefits of a crime and hence the punishment required to deter it.")  This crime was very difficult to detect because it requires law enforcement to analyze each particular auction item to investigate

which bids were legitimate and which were shill bids. It is a time consuming and difficult task. For others in the auction industry with authority similar to defendant, a 20 month sentence will make clear that if law enforcement puts in the time and effort necessary to prove up shill bidding – the court will meet the conduct with a significant consequence.

**The Need to Avoid Unwarranted Sentencing Disparities**

Defendant points to a number of cases in which defendants in fraud cases received sentences of probation. However, as the defendant notes in his sentencing memorandum – shill bidding cases are quite rare. Docket Entry Number 184 (defendant's sentencing memorandum) at 55-56. Thus, the nature of the offense conduct in this case is unique and has not often been addressed by federal courts. As the Seventh Circuit has held, "Section 3553(a)(6) applies to defendants . . .who have been found guilty of *similar conduct*." *United States v. Durham*, 645 F.3d 883, 897 (7th Cir. 2011) (emphasis in original). In other words, "only *unwarranted* disparities are impermissible in sentencing*." United States v. Pape*, 601 F.3d 743, 750 (7th Cir. 2010) (emphasis in original). Accordingly, because many of these cases do not address similar conduct – any disparity from the list of cases should not be viewed as an unwarranted one. The case that's defendant cites that address shill bidding are distinguishable in that they do not address a scheme led by a defendant CEO for seven years, who recruited a lower level employee to help with the scheme, and to later tell that same employee to destroy years of records evidencing the scheme. Given the unique conduct in this case, any disparity between a 20 month sentence

27

and probation will be thoroughly warranted. A greater disparity would be created if defendant were to be sentenced to a term of probation because his co-defendant William Boehm, the lower level employee that defendant recruited and used in the scheme, was also sentenced to a term of probation. It would certainly create a disparity to have the most culpable member of a scheme – the defendant - and the least culpable – Boehm - receive essentially the same sentence.

Moreover, the advisory guidelines range itself provides an objective range that promotes the goal of minimizing unwarranted sentencing disparities. *See e.g.,* *United States v. Mykytiuck*, 415 F.3d 606, 608 (7th Cir. 2005) ("[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country"); *United States v. Borcarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("disparities are at their ebb when the Guidelines are followed for the ranges themselves were designed to treat similar offenders similarly. Treating similar offense similarly "was the main goal of the Sentencing Reform Act" and "[t]he more out-of-range sentences that judges impose . . . the more disparity there will be." *Boscarino*, 437 F.3d at 638.

Therefore, the Court should give serious consideration to the advisory Sentencing Guidelines. And, while the government is asking for a below Guidelines sentence – a sentence of probation is thoroughly at odds with the guidelines which call for a significant sentence of imprisonment.

## V.    Conditions of Supervised Release

If the Court sentences defendant to a term of supervised release, in light of the Seventh Circuit's decision in *United States v. Thompson*, 2015 WL 149501 (7th

Cir. Jan. 13, 2015), the government makes the following recommendations regarding the mandatory and discretionary conditions of supervision:

**Mandatory Conditions** (per 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)

These are not only mandatory, but the following conditions will assist in deterring future criminal conduct, facilitate his supervision by his assigned probation officer, and aide his reintegration into the community:

- The defendant shall not commit another federal, state or local offense.

- The defendant shall not unlawfully possess a controlled substance.

- The defendant shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office if the collection of such a sample is authorized pursuant to 42 U.S.C. § 14135a(a).

**Discretionary Conditions of Supervision** (Per 18 U.S.C. § 3583(d) & U.S.S.G. § 5D1.3(c) & (d))

In order to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes, the government recommends the following conditions:

- The defendant shall not leave the judicial district in which the defendant is being supervised without the permission of the court or the probation officer.

- The defendant shall report to the probation officer as directed by the probation officer.

- The defendant shall follow the instructions of the probation officer.

- The defendant shall notify the probation officer of any change in residence, employer, or workplace within 72 hours.

- The defendant shall refrain from excessive use of alcohol (defined as having a blood alcohol concentration greater than 0.08%, or any use of a narcotic drug or other controlled substance, as defined in § 102 of the Controlled Substances Act (21 U.S.C. § 802).

- Defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.

- Defendant shall refrain from possessing or using narcotic or controlled substances except as prescribed by a physician.

- The defendant shall permit the probation officer to visit the defendant at home or work at any reasonable time, and to confiscate any contraband in plain view of the officer.

- The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.

## VI.    Conclusion

The government seeks a sentence of 20 months' imprisonment in this case. Such a sentence is well supported under Section 3553(a), as it will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from future crimes of defendant, properly account for defendant's history and characteristics, and ensure a fair and uniform sentence.

Dated: August 13, 2015

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:    /s/ Steven J. Dollear
Steven J. Dollear
Derek Owens
Assistant United States Attorneys
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-5300

30